UTICA MUTUAL INSURANCE COMPANY, a corporation, Appellant,

v.

Robert E. ROLLASON, Administrator of the estate of Richard Moncure Young, deceased, Appellee.

No. 7389.

United States Court of Appeals Fourth Circuit.

Argued April 10, 1957.

Decided May 28, 1957.

W. Worth Martin, Newport News, Va., and Theodore C. Pilcher, Norfolk, Va. (Hall, Martin & Smith, Newport News, Va., and Pilcher, Pilcher & Winters, Norfolk, Va., on the brief), for appellant.

H. Lee Kanter, Norfolk, Va. (Kanter & Kanter, Norfolk, Va., on the brief), for appellee.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and PAUL, District Judge.

SOBELOFF, Circuit Judge.

Our decision is required on a question of coverage under the omnibus clause of a garage liability policy.

The insurer is Utica Insurance Company, and the insured is Royals' Motor Service Company, Inc., of Hampton, Virginia. By the terms of the policy the word "insured" is defined to include not only the named insured, but also any other person using the automobile covered by the policy, provided the use is with the permission of the named insured.[1]

Royals' Motor Service Company delivered possession of the insured automobile to its service manager, Paul T. Davis, from whom it was received by his son, Donald Lee Davis. In the early morning hours of December 19, 1954, while Donald was driving in Hampton, an accident occurred which resulted in the death of three of his passengers—a brother, Gerald Davis, and Richard Moncure Young and Betty Ruth Coddington. The latter two were students at William and Mary College whom Donald was taking back to Williamsburg. Three other students were also passengers in the car at the time, and suffered injuries.

Suit was filed by Young's Administrator, Robert E. Rollason, who recovered judgment against the operator, Donald Lee Davis. Execution on the judgment was returned unsatisfied, and the plaintiff, availing himself of the omnibus clause of the policy, sued the insurance company and recovered judgment in the total sum of $19,099.00 and costs. From this judgment the present appeal was taken.

The crucial question is whether or not the automobile was being used at the time of the accident with the permission of the named insured, as "permission" is meant in the policy. This question in turn may be separated into three: first, did Royals give Paul T. Davis permission to make general use of the automobile including use for personal purposes; second, did Davis have implied permission to lend the automobile to his son for personal use; and third, assuming an affirmative answer to the first two questions, was the use of the vehicle by young Davis, for the purpose in which he was engaged at the time of the disaster, with his father's unrestricted permission and hence, in legal contemplation, with the permission of Royals. Concededly, there was no express permission, but it is undisputed that permission may be either express or implied from the circumstances.

[1]. The relevant policy provisions are as follows:

"Insuring Agreements

I Coverage A—Bodily Injury Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the hazards hereinafter defined.

* * * * *

"Definition of Hazards

Division 1—Premises—Operations—Automobiles

The ownership, maintenance or use of the premises for the purpose of an automobile dealer, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, and (2) any automobile owned by the named insured in connection with the above defined operations for the use of the named insured, a partner therein, an executive officer thereof, or a member of the household of any such person.

* * * * *

"Definition of Insured

With respect to the insurance under coverages A, B and D the unqualified word 'insured' includes the named insured and also includes (1) any partner, employee, director or stockholder thereof while acting within the scope of his duties as such, and any person or organization having a financial interest in the business of the named insured covered by this policy, and (2) any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission."

■ Based upon a stipulation of the employment contract and the policy, and upon an affidavit by an official of the Royals' Company asserting that Davis had permission to use the car only to travel to and from work, the defendant moved for summary judgment. The plaintiff likewise filed affidavits and a motion for summary judgment. As these documents raised substantial issues of fact, the District Judge properly overruled both motions.

At the conclusion of the testimony the appellant moved for a directed verdict, upon which the Judge deferred action, and submitted three special inquiries to the jury, substantially as above indicated. The jury answered each question in the affirmative, finding that there was permission for the use of the automobile by Davis for personal as well as business purposes, that he had implied permission to loan and did loan it to his son without restriction, and that the vehicle's use at the time of the accident to transport the students to Williamsburg was with the implied permission of Royals' Motor Service Company, Inc. We are to decide whether the Court should have directed a verdict for the defendant, and this depends on whether or not there was sufficient evidence warranting submission of the special issues to the jury.

Some weeks before the accident and while the policy was in force, the Royals' Motor Service Company, Inc. entered into a written employment agreement with Paul T. Davis. The agreement contained the following provision:

"* * * The party of the first part [Davis] shall receive a weekly salary of $115.00 until February 1, 1955 at which time his salary will be raised to $125.00. The party of the first part shall be furnished by the party of the second part, transportation without gasoline until February 1, 1955, after which time the party of the first part will furnish his own transportation * * *."

■ When Davis came to work for Royals in the fall of 1954, the insured Hudson automobile was turned over to him. There is disagreement between Davis and Clyde R. Royals, Jr., an officer of the Motor Company, as to what was said about the use of an automobile during the negotiations for Davis' employment and at the time the Hudson automobile was delivered to Davis. The provision in the employment agreement entitling the employee to "transportation without gasoline" is not enlightening as to the point in dispute here—the extent of the permission granted. We must, therefore, look beyond these words, in accordance with the traditional rule which permits extrinsic evidence when written language is ambiguous.

In the circumstances of this case, the District Judge would not have been justified in directing a verdict for the defendant, for this would have required giving the words a fixed meaning which they do not possess. Royals' version is that he limited the use of the automobile to transportation of Davis to and from work. This Davis denied, insisting that it was understood that he should have the use of the automobile generally, for personal, as well as business purposes. It is suggested that the little gasoline consumed by the employee in travelling from his house to his job, a comparatively short distance, would hardly have been considered of sufficient consequence to call for a special provision in the contract. Davis testified explicitly that he told Royals that he had to have a car because his Plymouth was fourteen years old, but that he could not afford a new car then; that he wanted a "decent automobile," one "proper to ride around and visit in." He was willing, he says, to use an older car for work, during the week, but he told Royals in the course of their negotiations that on weekends or to go to church or to ride around on Sunday, he was to have a later model. He exercised complete control over the insured Hudson from the time he received it from Royals, and used it for personal business, for Sunday riding, and going to the theatre, "or whatever became necessary," including use by his wife and by his son,

Gerald, on weekends. Although Royals' testimony was to the contrary, Davis swore that he was seen by Royals making use of the car on Sunday for non-business purposes.

Davis further testified that in discussing terms of employment he had demanded, in addition to commissions, $125.00 per week and an automobile, and Royals offered to make the salary $100.00. Davis says Royals pointed out that insurance on the car would cost $10.00 per week, which Royals thought Davis should pay. Thus they agreed upon a salary of $115.00 per week and the Motor Company was to furnish him a car ("transportation without gasoline") till February 1, 1955, but after that he was to receive $125.00 per week and furnish his own transportation, for it was expected that by that time earnings on the commissions would be sufficient to enable him to buy a new car and supply his own transportation. Mr. Royals admitted that $10.00 per week was the estimate of the cost of furnishing a car to Davis, covering normal wear and tear and insurance.

The elder of Davis' sons, Donald, age 21, had but recently returned from several years of military service in Germany. On the evening of December 18, 1954, about 8:30 p. m., he was at home when his younger brother, Gerald, 19, an enlisted marine stationed at Quantico, arrived on Christmas furlough. The two brothers decided to celebrate the reunion after their long separation. Gerald declined his mother's offer to prepare a meal, saying that he had had a sandwich shortly before his arrival. She quotes him as saying, "We are going out for a while, so I'll get something then if I get hungry." The family spent the early part of the evening talking and wrapping Christmas packages, and about 10:30 p. m. the two young men announced that they were going out "to do the town, see some of their friends and get something to eat." Donald sought and obtained his father's permission to use the Hudson.

The brothers left in the automobile, stopped at a couple of nearby restaurants, at one of which they met five students from the College of William and Mary in Williamsburg, which is about 28 or 30 miles from Hampton. As the students had no way of returning that night to Williamsburg, Donald agreed to take them there when they offered to pay for the gasoline. It was then about 2:00 a. m. They proceeded to a point only about a mile or so distant from the Davis home, when the accident happened.

It is not claimed that when Davis turned the automobile over to his son any trip to Williamsburg was mentioned specifically, but Davis unequivocally testified that his permission to Donald to use the car was without restriction, "to use it as he saw fit;" that he said nothing to rule out a trip to Williamsburg, and would not have objected if the question had been directly raised; that he considered the use made of the car within the general permission he had given, and he instanced trips made with his consent to other towns, including Yorktown, which is twenty miles from Hampton. Asked on cross-examination if he would have sanctioned a trip to Richmond, he replied that he would, considering that the boys were home for the holidays and that "it was a happy occasion."

Much of the testimony was disputed by the defendant, particularly Davis' version of conversations with Royals about the extent of the use authorized. There was enough, however, to predicate a belief that the Hudson was put at Davis' disposal for his personal use and that of his family, with no more restriction as to use than if it were his own. The testimony as to the events of the early evening of December 18, while not directly contradicted, gave rise to conflicting arguments. For example, the defendant insistently maintained that the permission given Donald by his father was to take the car only to get something to eat, while the plaintiff argued that getting food was only an incidental, not the sole or primary purpose of the journey. So too, the defendant urged that it should be ruled as a matter of law that undertaking, in the early morning hours, a

journey with the students to Williamsburg exceeded the permission granted Donald when his father loaned him the automobile. But there is no legal precept which points inflexibly to a certain conclusion based upon this isolated fact; it is to be weighed in the entire context, which may be thought to color it one way or another.

■■ All such debates were properly for the jury, whose function it was to make a choice between conflicting testimony and opposing inferences. We are satisfied that there was testimony sufficient, if believed, to warrant the jury's affirmative answers to the issues as to permission from Royals to Davis and from him to his son. The manner of the Court's submission of the issues to the jury was, we think, unexceptionable, and it was not objected to by the defendant; in fact, defendant's counsel candidly declared the charge "most admirable." We have, therefore, simply a disputed fact issue which the jury has resolved in favor of the plaintiff, and its action cannot be reconsidered by us on appeal.

■ The defendant points to certain statements elicited from Davis on cross-examination, which are said to negative permission. Assuming this to be so, it would still not require a directed verdict for the defendant, since it is the function of the jury, not of the judge, to appraise the evidence. Our inquiry is not whether there was evidence to support a result contrary to the jury's verdict, but whether there was evidence legally sufficient to support the verdict that was found.

■ With the termination of the factual contest, the legal issues brought into focus are found to be neither novel nor difficult. If an insured automobile is left by the owner with someone for general use and he in turn permits its use by another, the use is deemed to be with the permission of the owner. Robinson v. Fidelity & Casualty Co. of New York, 1950, 190 Va. 368, 57 S.E.2d 93; Liberty Mutual Insurance Co. v. Tiller, 189 Va. 544, 53 S.E.2d 814; Hinton v. Indemnity Ins. Co. of North America, 175 Va. 205, 8 S.E.2d 279; Employer's Liability Assurance Corp. v. Carroll, 4 Cir., 139 F.2d 427; Indiana Lumbermen's Mutual Ins. Co. v. Janes, 5 Cir., 1956, 230 F.2d 500, applying Virginia law; Trotter v. Union Indemnity Co., 9 Cir., 35 F.2d 104; Odden v. Union Indemnity Co., 156 Wash. 10, 286 P. 59, 72 A.L.R. 1363.

■ The standard omnibus clause was required by the Virginia statute to be included in the policy. Title 38.1, Section 381, Code of Virginia (1950). The generally recognized approach of the courts is to give this clause a liberal interpretation to effectuate the public policy of affording injured persons protection. Said the highest Court of Virginia in Fidelity & Casualty Co. of New York v. Harlow, 191 Va. 64, 59 S.E.2d 872, 874:

> "The statute is remedial and must be liberally interpreted to subserve the clear public policy reflected in it, which is to broaden the coverage of automobile liability policies. In defining 'implied permission', and applying it to the facts of the many cases we have had, this Court has been liberal in its interpretation and application, and has gone far in holding insurance carriers liable."

Through Judge Dobie this Court has likewise, in Chatfield v. Farm Bureau Automobile Insurance Co., 4 Cir., 1953, 208 F.2d 250, 256, summarized its decisions as follows:

> "Our own decisions, we think, show a strong tendency toward a liberal interpretation in favor of the insured, of the 'omnibus clause.' This clause *should not be construed* and applied, from a purely *analytical viewpoint*, under a *literal interpretation* of the words of the policy. *The spirit, not the letter*, should control. Statutes requiring the insertion of the 'omnibus clause' in automobile liability policies reflect a clear cut policy to protect the public. They should be construed and applied so as to carry out this policy." (Italics added.)

Finally, a point has been raised and argued as to a ruling on the admissibility

of testimony. We find no merit in the contention. When Paul T. Davis was under cross-examination, counsel for the insurer undertook to discredit him by showing that he was so prejudiced and biased against the insurance company that during the pendency of the original suit, in the State Court, he had refused to sign a certain affidavit. This affidavit had been prepared for use in the defense of the witness himself and Royals, both of whom were co-defendants with Donald Davis. It was sought to be shown that Davis withheld his signature although the tendency of the affidavit was to absolve him from liability, as it contained a denial that his son Donald was driving the car as his agent. The District Judge declined to allow the inquiry, and this is the ruling complained of.

The relevancy of any question of agency is not apparent, as the issue in the pending case was not one of agency but one of permission—a pointedly different thing. When the operator of a vehicle goes as the owner's agent on a mission for his principal, the principal is in law liable for the agent's negligence. When an owner entrusts his vehicle to another, to use it for the bailee's own purposes, the owner is not liable for the bailee's negligence, U-Run-It Co. v. Merryman, 154 Va. 467, 153 S.E. 664, 666, because there is no relation of agency between them. The bailee, however, is covered under the omnibus clause of the insurance policy because it does not require the existence of an agency, but merely that the bailee shall have acted with the permission of the insured owner.

Moreover, as there was no issue of non-cooperation in the District Court and the insurance company expressly disavowed this defense, the cross-examination was not pertinent on this score.

If, however, it be assumed that the insurance company was nevertheless entitled to show Davis' prejudice and bias in refusing to sign the tendered affidavit, we consider the ruling harmless, for the witness' interest in the outcome of the suit was altogether too manifest to require further proof. The jury knew that the judgment recovered in the original suit was against the witness' son, and that unless the plaintiff prevailed against the insurance company in the instant case, that judgment would remain open against that son. The jury knew, in addition, that as the surviving parent of Gerald, Paul Davis was interested, not in negating, but in establishing, that Donald's operation of the automobile was with his permission. All this was plainly apparent and was doubtless considered in weighing the credibility of the witness. If these incontestable facts did not sway the jury to disbelief of his testimony, we do not think any elaboration on the point of bias would have influenced the verdict. Refusing to allow this phase to be further pursued could not have been harmful to the appellant. Rule 61, Federal Rules of Civil Procedure, Title 28 U.S. C.A.

The judgment of the District Court is Affirmed.

PAUL, District Judge (dissenting).

I am compelled to dissent from the majority of the court. I am of opinion that a verdict for defendant should have been directed in the District Court.

The case turns on the testimony of Paul T. Davis, whose son was driving the car at the time of the accident involved. There was, as the court's opinion notes, a conflict between the testimony of Paul Davis and that of Clyde R. Royals, Jr., the manager of Royals' Motor Company, who had negotiated and executed the agreement under which Paul Davis was employed by the Motor Company. This conflict related to the conditions under which Davis was allowed the use of the company car. I recognize the principle that on a motion for a directed verdict the evidence must be taken in the light most favorable to the party against whom the motion is directed. But while agreeing with this principle as a matter of law, I am of opinion that when we apply it here there is still no justification for this verdict.

The material part of the contract between the Motor Company and Paul Davis, including that part relating to the furnishing of a car to Davis, has been quoted in the majority opinion. When testifying as a witness for the plaintiff in the trial court Paul Davis produced certain papers which he said were notes which he had made during his negotiations with Mr. Royals over the contract of employment. This question and answer follow:

"Q. And what was the final agreement according to your notes there? A. One hundred fifteen dollars a week until February 1st, 3 per cent on labor sales up to $4,000.00; 5 per cent on labor sales over $4,000.00; and transportation furnished to February 1st, 1955; at this time salary to go to $125 a week and commission as is."

Although Davis' own notes and the contract which he signed designate the use of the company car as being for "transportation", he now claims that he was granted unlimited use of the car. A basis for this contention can be found only in certain leading questions propounded by counsel for appellee and the answers thereto; for example:

"Q. Mr. Davis I ask you, sir, was there at any time, either from Mr. Royals, Jr. or Mr. Royals, Sr. or anyone else in the Royals organization, a restriction placed on your use of the vehicle that they gave you to drive? A. None whatever."
And again:
"Q. During the course of your employment over there, from the time you went to work until the time the accident took place, Mr. Davis, did you use the car that you were driving for your personal business as well as for the company's business? A. Yes, I did."

It will be noted that the last quoted question and answer (one of a number of similar ones) are directed to the use which Davis made of the car after he got it and not to the use for which the Motor Company granted it. It is a striking fact that nowhere in his testimony does Davis say that the Company allowed him the use of the car intending it to be for his personal and family use. He tells what use he made of the car but is unwilling to say that the Company agreed to such use.

It is admitted that in the negotiations between Mr. Royals and Davis concerning the latter's employment, Mr. Royals was reluctant to give Davis the use of a company car for any purpose, because it was against the policy of the company. However upon Davis' representation that the only car he owned was a very old one the use of which was required by his wife for various errands and that he had no other means of transportation, Mr. Royals agreed to let him have a car for a limited period of five months, after which Davis was to furnish his own transportation. I quote again from Davis' testimony:

"And at that time I wasn't able to buy a car. * * * He (Royals) says: 'Well with the money I think you are going to make for the service department we'll help you buy a car in February and you can furnish your own transportation but I'll furnish you a car until that time.'"

Indeed, he says that use of the car for purposes other than transportation to and from work was not even discussed with his employer, as witness the following:

"Q. At any time during your conversation with Mr. Royals, Jr. did he make it clear to you in any way or imply in any way that your use of the car was to be limited to your driving it from the shop out to your house at night and then bring it back in the morning. A. No, sir. It was never discussed and of course if it had been limited to that extent I would have declined his offer."

In other words, Mr. Davis, having agreed with his employer that a car should be furnished him for "transportation", proceeded to interpret that term as giving him unlimited use of the car, without even discussing the matter further.

But even if we assume that the employer had given Davis permission to use the car for what he calls his "personal business" or that in the absence of such permission the car was being so used with the knowledge of the employer—as to which knowledge there is no proof—there would still be no basis for holding that the employer had consented to an unrestricted use of the car by members of Davis' family. The testimony of Davis himself shows that there was no general use of the car by his family and indicates that he was conscious of the fact that his employer had not given permission for such use.

Questioned about use of the car by members of his family Mr. Davis stated that "(it) was unusual circumstances for me to let a member of the family use the car." He further testified that he had allowed his wife to use the company car on one occasion; and had allowed his younger son to drive it two, or possibly three, times while on week-end passes from military camp. Although the older son, Donald, had been continuously at home for ten or eleven days preceding the accident he had, during this period, used the family car whenever he had occasion to use an automobile, and had never driven the company car until the night of the accident. Furthermore, Mr. Davis admitted that when Donald, on the night of the accident, asked for permission to use the company car, "I told him no at first, that I thought he better not use the company car, and that he had better take the Plymouth out." And that when Donald "(t)old me that the radiator on the Plymouth was overheating and that it wouldn't hurt to take the Hudson or company car, I then gave in and allowed him to take the car." Asked if anyone connected with Royals Motor Company knew that he had allowed members of his family to drive the company car, Mr. Davis replied that so far as he knew they did not know of it and "I didn't tell them".

Out of all of this, the majority of the court reaches the opinion that there was sufficient evidence to justify the conclusion that the Royals Motor Company gave its implied permission for the car to be used by Mr. Davis' sons to ride about the country at two o'clock in the morning transporting a group of strangers from Hampton to Williamsburg—a conclusion I am unable to accept.

The court, I think, unduly emphasizes the question of the extent of the permissive use given by Mr. Davis to his sons when they took the car out on the night of the accident. The permissive use covered by the insurance policy is a use with the permission of the *named insured,* which was Royals' Motor Service Company; not permission given by someone to whom the named insured had entrusted the car. If the named insured had not given its permission for use of the car by Davis' sons (there was certainly no express permission and I think none can be implied) then the appellant cannot be affected by any permission given them by Davis.

Under the rule of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this case is governed by the law as declared by the Virginia courts, which interpret permissive use of an automobile more strictly than is done in many other jurisdictions. In Sordelett v. Mercer, 185 Va. 823, 835, 40 S.E.2d 289, 294, the court says:

> "(t)he express or implied permission referred to in the statute means the express or implied permission to use or operate the motor vehicle either in the business of the owner or for any other purpose for which express permission was given or as to which it may be implied that permission was given. Permission to do a specific thing is not permission to do all things."

It is to be borne in mind that Davis testified that he did not even discuss with his employer whether his use of the car was to be limited to transporting him to and from work and, therefore, that he evidently had no express permission beyond that, and that the use of the car on his personal business derived only from his assumption that he had a right to so use it. Even if his assumption were

correct, or even if we were to assume (which clearly is not proven) that his employer had given him express permission to use the car in connection with his personal errands around town, it is not seen how this constituted implied permission to him to turn the car over to his sons to go joy riding.