**ALLSTATE INSURANCE COMPANY,**
a Corporation, Plaintiff,

v.

**MERCHANTS HARDWARE COMPANY,**
a Corporation, American Hardware Mutual Insurance Company, a corporation, Jerry R. Eaton, Evelyn Louise Eaton, Rodney L. Ingraham, Larry G. Ingraham, Jr., Larry G. Ingraham, Gladys L. Ingraham, Agnes A. Tanner, Administratrix of the Estate of Norma Jean Tanner, deceased, Raymond Glenn Tanner, William Carol Tanner, Beverly Tanner, Earl C. Collins, Administrator of the Estate of Lillie H. Collins, Jeannette Collins and Janie Lou Collins.

No. 565–F.

United States District Court
N. D. West Virginia,
at Fairmont.

Dec. 22, 1959.

2. See Restatement of Torts, § 766.

John R. Morris, Robert B. McDougle, and McCluer, Davis, McDougle, Stealey & Morris, Parkersburg, W. Va., for plaintiff.

Thomas W. Bayley, Parkersburg, W. Va., for defendant Merchants Hardware Co.

H. O. Hiteshew and Charles V. Renner, Hiteshew, Cather, Renner & Parker, Parkersburg, W. Va., for defendant American Hardware Mut. Ins. Co.

William Bruce Hoff and Daniel A. Ruley, Jr., Parkersburg, W. Va., for all defendants surnamed Ingraham and Tanner.

HARRY E. WATKINS, Chief Judge.

This is an action for declaratory judgment under 28 U.S.C.A. § 2201, tried by the Court, and arising out of an automobile accident in which several persons, riding in a truck owned by defendant, Merchants Hardware Company, and driven by Jerry R. Eaton, were killed or injured. Plaintiff, Allstate Insurance Company, had liability coverage on Eaton, the driver, and defendant, American Hardware Mutual Insurance Com-

pany, had liability coverage on Merchants Hardware, the owner of the truck. Allstate claims that Hardware Mutual is the primary insurer and that its liability is secondary to the liability of Hardware Mutual. On the other hand, Hardware Mutual says that the omnibus clause of its policy does not cover this accident because the truck was being operated without the permission of the named insured.

A pre-trial conference was held, at which it was agreed that the sole issue in the case was as follows: "Did Jerry R. Eaton have permission of the Merchants Hardware Company, within the meaning of the American Hardware Mutual Insurance policy, to drive the Dodge truck at the time and place of the accident and under all of the circumstances shown by the evidence?" It was further stipulated at the pre-trial conference that all depositions which had theretofore been taken for discovery would be used as evidence in the trial of the case. There were depositions of several persons so taken, and these have been considered together with the testimony adduced at the trial, in the determination of this case. In deciding the facts the Court has taken into consideration the credibility of the witnesses, their interest in the outcome of the case, and the extent to which the testimony of each witness is in conflict with the testimony of other witnesses.

On Sunday, August 4, 1957, defendant Jerry R. Eaton was driving a Dodge truck owned by defendant Merchants Hardware Company in Wirt County, West Virginia. There were ten other persons on the truck, and an accident occurred. Defendants, other than Merchants Hardware and Hardware Mutual, were either riding on the truck at the time of the accident, or appear as personal representatives of persons who were so riding. Many suits have already been brought to collect damages.

Raymond Glenn Tanner, a shipping clerk, had taken the truck from his place of employment, Merchants Hardware, at Parkersburg, West Virginia, for the weekend. The circumstances under which he took the truck will appear later. Jerry R. Eaton was driving the truck at the suggestion of Raymond Glenn Tanner. Eaton was not employed by Merchants Hardware.

The Hardware Mutual policy contains an omnibus clause which defines those persons insured under the policy. Those portions of this clause which are pertinent to the present case appear as follows:

"With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured * * * and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured * * * or with [its] permission."

Thus, in order for Hardware Mutual to be held as an insurer herein, it is necessary that Raymond G. Tanner—and, through him, Jerry R. Eaton—fit within the definition of an insured as set forth in the above quoted clause.

Merchants Hardware is a small wholesale hardware company located in Parkersburg, West Virginia. The truck involved, a 1957 Dodge K-300 One Ton Stake Truck, was the only truck owned by Merchants Hardware at the time of the accident.

On Saturday, August 3, 1957, Tanner was employed as a shipping clerk by Merchants Hardware in Parkersburg, West Virginia. He rode to work that morning with his uncle, Robert V. Wigal, who was employed as a salesman by Merchants Hardware. Wigel drove a Plymouth Station Wagon, owned by Merchants Hardware, which he used for business purposes. Wigal and other traveling salesmen were furnished with a car and, for obvious reasons, were permitted to take the car assigned to them to their homes at night. Since Tanner was a shipping clerk, he was not furnished with

a company car and had to furnish his own transportation. On Saturday, August 3, he rode to work with his uncle, his own car being broken down. The store remained open until noon, and Tanner took the truck home with him for the weekend. Tanner asked Wigal if he thought it would be all right for him to drive the truck home. Wigal replied that he thought it would "probably be all right with Mr. Wroth" and that if Wroth were there "he would probably let him take the truck." The Mr. Wroth of whom Wigal was speaking is John Wroth, Sr., the president and general manager of Merchants Hardware. When asked if he objected, Wigal stated "I had no objection either way." Wigal did not have authority to grant permission to Tanner to take the truck home over the weekend and did not give Tanner such permission. He so testified and his statements are supported by the weight of the evidence. Tanner, who has a suit now pending against Eaton to collect damages for injuries sustained in the accident, testified that he took the truck at the suggestion of Wigal, as Wigal was going on a fishing trip and it would save time. At the same time, Tanner admitted that Wroth, Sr., "had complete control of the operation of these trucks." There is no evidence that Wigal had ever given permission to anyone to use company trucks prior to August 3.

Wigal said that no one person was in charge of the store that morning; that each salesman has a key to the building; there was no cash register; that no one in particular was in charge of the cash box; that he took no account of the sales for the day; did not check money in cash box when closing; did not make bank deposits; did not know the combination to the safe; and that his duties were to sell merchandise on the road and make sales in the store when he was there.

At the time the truck was taken, John Wroth, Sr., was out of town. From all the evidence, it appears that he was the person in authority at Merchants Hardware. He was the person who gave orders and had management and control of the trucks. The shipping clerk only gave truck drivers instructions about delivering orders. John Wroth, Jr., who was normally in charge of the business when his father was not present, was likewise out of town. Prior to the departure of John Wroth, Sr., he had told the office girl, Joanne Fox, that he was to be contacted by telephone if any decision had to be made. Wigal says that Joanne Fox informed him of this instruction. Miss Fox was not at the place of business on the Saturday morning in question.

There were, in fact, four persons present on that Saturday morning who were employees of Merchants Hardware. In addition to Tanner and Wigal, those present were Fred Pritchard, also a salesman, and Roger A. Van Camp, a truck driver. Mr. Wigal opened and closed the store that morning, and got the cash box from the safe. Wigal did not have the combination to the safe, it having been left unlocked. Both salesmen, Wigal and Pritchard, were usually out of town during the week, and stayed at the store on Saturday mornings. Either Pritchard or Wigal opened the store, as a general rule; both had keys. Pritchard was the senior employee, in time of employment, of those present. No evidence appears in the case to indicate that any provision had ever been made as to who, if anyone, should be in charge of the other employees, as between those actually present on the morning in question. It appeared that Tanner, himself, had some authority concerning the company truck, but this appeared limited to the directing of the driver on his delivery route. Tanner had been shipping clerk for only twenty days prior to August 3, 1957. Before that time he had been employed at intervals for about fourteen months as a truck driver. While employed as a truck driver, he had taken a company truck home with him on a few occasions. Most of these were to enable him to get an earlier start on journeys to other cities to pick

up supplies for his employer, but on some of these occasions he had used the truck for his own, rather than his employer's, benefit. However, the evidence shows that on each occasion, whether the use was for the benefit of Tanner or his employer, the permission of John Wroth, Sr., had been secured prior to the taking of the truck. On one occasion, Tanner had taken the truck with the permission of William Doolittle, who was shipping clerk at the time, but Mr. Doolittle testified at the trial that he had inquired of Wroth whether or not Tanner could take the truck, and did not give his own assent until Wroth had approved the taking. Tanner testified that on this occasion he did not remember whether the truck was used for business or personal reasons. Tanner testified that, on another occasion, Doolittle had allowed a truck driver, Cleve Griffin, to use a truck for personal purposes but he presumed that Wroth, Sr., had given permission. There was no evidence that a company truck had ever been used for personal business without the express consent of John Wroth, Sr.

One of the contentions of plaintiff is that Merchants Hardware had obligated itself to provide transportation for Tanner to and from his home and the place of business. The reasons advanced for this are that Merchants Hardware had furnished Wigal with a 1955 Plymouth Station Wagon for his use as a salesman, and that he had taken Tanner home and to work on different occasions when Tanner's car was not in operation. However, it appears from the weight of the evidence that this arrangement was one between Tanner and Wigal individually, and was not an action of the company. Tanner was transported by Wigal in the company station wagon, but this is not inconsistent with any position of the company, inasmuch as Wigal and the other salesmen were permitted to use the cars assigned to them to go to and from their homes. Wigal and Tanner lived about three miles apart and, as stated before, Wigal was an uncle of Tanner's. Wigal had taken Tan-

ner to work on five or six occasions in the company car, although Tanner insists that it occurred about twenty-five times in the twenty-day period he was employed as a shipping clerk between July 14, the date of employment, and August 4, the date of the accident. The testimony of Tanner is in conflict with testimony of both Wigal and Wroth in other respects. Wroth, Sr., stated that he did not know that Tanner rode to and from work with Wigal, and this is supported by Wigal's testimony. Tanner says that so far as he knew Wroth, Sr., did not know of this arrangement. To impute the action of Wigal in sometimes transporting Tanner to and from his home to an obligation to do so on the part of the employer is a conclusion not justified under the facts and circumstances as shown by the evidence. From this and other evidence, this Court must conclude that Tanner did not have express permission of Merchants Hardware to take the truck on August 3, 1957.

It is well settled that the permission by the named insured required to extend the insurance protection under the omnibus clause to the actual user need not be express but may be implied. "The initial permission given by the named assured to the original permittee includes, according to the better view, the use of the automobile by the second permittee where in doing so the second permittee serves some purpose, benefit, or advantage of the first permittee." 160 A.L.R. 1195, 1206.

It is urged by counsel that Tanner had implied permission to use the truck, but Tanner testified that no one except Wigal authorized him to take the truck. Throughout his evidence, Tanner takes the position that such permission as he had came from Wigal, who, he says, told him to take the truck. Tanner knew from past experience that he could not take a company truck home except by special permission of Wroth, Sr., and he had always obtained such express permission. He was asked the following question by counsel for plaintiff and gave the following answer: "The only time

you had to ask permission of anyone to use the truck was when you were using it for something other than company business. Isn't that true?" Answer: "That's right."

In Hinton v. Indemnity Insurance Company, 175 Va. 205, 8 S.E.2d 279, 283, the Court said: "Under the Virginia statute, the permission of an assured in a liability insurance policy, to bind the insurance company, may be either express or implied. To be express, it must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference. On the other hand, the correlative word, 'implied,' as defined in Webster's New International Dictionary (2nd Ed.), means 'inferential or tacitly conceded.' It involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent. An implied permission is not, therefore, confined alone to affirmative action."

The trouble here is that both Wroth, Sr., and Tanner knew and understood that special permission was necessary to take the truck home over the weekend. There was no mutual acquiescence to the contrary. Implied permission is based upon a course of conduct, a mutual acquiescence in, or lack of objection to, a continued use of the car, signifying assent. Here there is no such course of conduct. Previously, permission was asked and granted when trucks were used for personal reasons. There were no prior circumstances to indicate that the owner acquiesced or assented to Tanner's use of the truck to go home over the weekend. And there was nothing to indicate to the owner of the truck that Tanner would do so. The case at bar is one involving a single transaction and not one involving a course of conduct of the type relied upon by plaintiff. In each of the cases cited and relied upon to establish implied permission, there was a course of conduct, signifying assent. Since such cases are not in point, they are not here discussed. The fact that

Tanner and others always asked and always received permission from Wroth, Sr., to use the trucks would certainly not signify assent or acquiescence to take the trucks without express permission. On the contrary, it would corroborate Tanner's own statement that he understood that he had to ask permission to use the truck "for something other than company business".

Plaintiff and some of the defendants make much of a contention that after the accident Wroth, Sr., did not reprimand Tanner for taking the truck. Wroth testified that he told Tanner that "it was a terrible thing to do and had resulted in a terrible accident. I didn't discharge him. I didn't reprimand him other than to say that."

This finding that Tanner had no permission, express or implied, should be determinative of this action. However, there is another reason why Tanner did not have permission to use the truck under the circumstances. Assuming *arguendo* that Tanner did have permission to take the truck home for the weekend, he did not have permission to use the truck for the purpose it was being used at the time of the accident. Consequently, Eaton, the driver, did not have permission of Merchants Hardware, within the meaning of the Hardware Mutual Insurance policy, to drive the truck at the time and place of the accident and under all the circumstances shown by the evidence, and the issue agreed upon at the pre-trial conference must be answered in the negative.

This Court is, of course, bound by the substantive law of West Virginia under the Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, doctrine. While many states had long since formulated rules for liability of an insurance carrier under an omnibus clause such as is involved here, it was not until 1954 that West Virginia selected the rule it would follow. In Collins v. New York Casualty Co., 1954, 140 W.Va. 1, 82 S.E. 2d 288, 298, which is the first and last case in West Virginia on the subject,

the West Virginia Supreme Court of Appeals said:

"From the cases which involve gross and slight deviations from the purpose and use of an insured automobile, for which permission in the first instance has been granted by the insured, three separate rules have evolved: (1) Those case[s], holding that any deviation from the permission of the insured as initially given, no matter how slight, will defeat liability under the policy; (2) those cases holding that permission once given will extend to all uses of the automobile, though the automobile may be used for a purpose and at a time and place not contemplated by the insured when the permission to use the automobile was granted; and (3) those cases which hold that a slight deviation does not violate the omnibus or extended coverage clause of an automobile public liability insurance policy."

■ The West Virginia court then chose the third, or "slight deviation" rule as the rule to be followed in the State courts, and this Court is bound to follow that rule.

The facts in that case were substantially as follows: Fodal owned the insured automobile and lived with his wife and child in Huntington, West Virginia. Stepp, a friend of Fodal, came to the latter's home and borrowed his automobile to drive uptown to collect some money. Fodal loaned Stepp the car with the understanding that Stepp would use it to collect the debt and then return immediately, to which Stepp consented. On prior occasions, Stepp had borrowed the Fodal car and had always returned it promptly. Stepp took the car, could not locate the person who owed him money, and then drove outside the city to an establishment where he began to drink beer. Several hours later Stepp became involved in an accident, at which time he was arrested for being intoxicated. The Court held that Fodal could not be held to have assented to the use Stepp made of

the car while on a so-called "frolic of his own".

The West Virginia court in that case further discussed the rule, and made the following statement as a further guidepost to the determination of factual situations:

"The slight deviation rule is based upon the premise that policies of insurance where ambiguous should be construed and where unambiguous should be applied to effectuate the intention of the parties; and where the deviation is such as was not contemplated by the insured and one to which in the first instance the insured would be presumed not to have assented, the coverage afforded by the omnibus clause of the automobile public liability insurance policy terminates."

With this guide in mind, the uncontroverted facts show that Tanner took the truck to his grandmother's after leaving work on Saturday. At about 9:30 A.M. on Sunday, August 4, 1957, Tanner drove the truck from his grandmother's house on Route 1, Elizabeth, West Virginia, to the Central Baptist Church (6 miles). Tanner's wife, as well as Rodney and Gail Ingraham, accompanied him. The same persons, plus Tanner's sister, Norma Jane, returned to the grandmother's home, arriving at about 11:30 A.M. (6 miles). At about 3:00 P.M., the same group was driven by Tanner to his father's house, a distance of about 15 miles. While there, Tanner drove a group consisting of himself, his brother, his sister, Rodney Ingraham, Gail Ingraham, and Jerry Eaton to the river for a swimming party. The distance to the river is about three-fourths mile. The same group returned to the father's home (¾ mile). Tanner, his wife, and the two Ingrahams returned to the grandmother's home after leaving the father's home at about 5:00 P.M. (15 miles).

Those same four persons left the grandmother's house at about 6:45, to go to a young people's meeting at the Baptist Church (6 miles). En route, Tanner picked up an elderly couple, Mr.

and Mrs. Philips. The young people's meeting ended at about 10:00 P.M., and Tanner drove back to his father's house, with his wife, his sister, his brother, "the two Collins girls", and "perhaps Mr. and Mrs. Eaton" on the truck (15 miles). They stayed there for about an hour, then departed to take the Collins girls home. On this trip, Eaton drove at Tanner's request, as Tanner was sleepy and had a headache. There were eleven persons on the truck: Tanner, his wife, his brother, his sister, Eaton and his wife, the "two Collins girls", Mrs. Collins, Rodney Ingraham, and Gail Ingraham. The truck had progressed four or five miles on the trip when the truck failed to negotiate a curve and went down a steep embankment. Thus, from the time of the taking of the truck from Merchants Hardware to the time of the accident, the truck had been used to transport persons for a distance in excess of fifty-five miles, for the personal convenience of Tanner.

The Court is not unmindful that the courts show a strong tendency toward a liberal interpretation in favor of the insured, of the omnibus clause, in such insurance policies, and have gone far in holding insurance companies liable. Utica Mutual Insurance Co. v. Rollason, 4 Cir., 246 F.2d 105, and cases there cited. However, where the evidence shows no permission, express or implied, or where there has been more than a "slight deviation" from the permission granted, the courts have not hesitated to say so. Collins v. New York Casualty Co., supra. Williams v. Travelers Insurance Co., 4 Cir., 1959, 265 F.2d 531. No case has been called to the attention of this Court which goes to the extent of allowing an inference of permission in defiance of uncontradicted testimony to the contrary. "Even a liberal construction of the policy's provisions will not justify disregard of its plain limitations." Farmer v. Fidelity & Casualty Co. of N. Y., 4 Cir., 1957, 249 F.2d 185, 188.

The strongest assumption, even *arguendo*, in favor of permission initially to Tanner, could not justify a permis-

sion greater than for Tanner to take the truck home, leave it for the weekend, and return in it to work on Monday morning. Assuming that there was such permission, there arises the question of whether or not the use to which the truck was put by Tanner constitutes more than a "slight deviation" from the permission given. It is the opinion of this Court that the weight of the evidence requires an answer in the affirmative. In the first place, the distance from Parkersburg to Tanner's home is about 20 miles, which would result in a round-trip distance of about 40 miles, if Tanner had confined his driving to that trip. In using the truck for his own purposes for an additional distance of over 55 miles, the risk of an accident was greater, because the exposure was greater. A second, and more important reason, is that the vehicle which was used was a large truck. The only provision made for the carrying of persons, as opposed to commodities, was the usual truck "cab". When Tanner had used the truck on prior occasions for his own use, with the permission of Wroth, Sr., the articles carried had been commodities such as hay and coal, and not a large number of persons. This Court is of the opinion that permission on some occasions to use the truck, or a similar one, for the hauling of such commodities cannot carry forward so as to form the basis for the implied permission to carry persons on the flat bed of the truck. Again, the reason is one of risk involved. Damage to commodities is a far different thing than damage or injury to many persons. This Court is aware that no one would give permission for the use of a vehicle if they knew an accident were going to happen, and, in the present case, permission and deviation must be considered without the fact of the occurrence of the accident in mind. But, on the other hand, apparent danger, the possibility of such an accident, and the subsequent liability, are definite factors in presuming permission, and the scope of such permission.

Counsel for the various parties involved in this action have cited many

598

cases from jurisdictions other than West Virginia. These cases have been considered in the formulation of this opinion, in aid of applying the facts herein to the law as contained in Collins v. New York Casualty Co., supra. The conclusion of this Court is that plaintiff Allstate is the primary insurer of Jerry R. Eaton, and that Hardware Mutual has no obligation to defend or pay any judgment arising from any suits which have or will result from the accident described above.

This opinion is adopted as the findings of fact and conclusions of law of this Court. Counsel for defendant Hardware Mutual may prepare an order according to the views expressed herein.