James E. BLANKENSHIP, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Defendant.

Civ. A. No. 745.

United States District Court
S. D. West Virginia.

Aug. 5, 1964.

Marshall G. West, Pineville, W. Va., for plaintiff.

Carl W. Belcher, Acting U. S. Atty., Charleston, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205 (g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), hereinafter referred to as the Act, to review a decision of the Secretary of Health, Education, and Welfare, hereinafter referred to as the Secretary. A decision rendered by a Hearing Examiner on November 20, 1962 became the final decision of the Secretary on January 31, 1963 when the Appeals Council denied plaintiff's request for review. The final decision holds that, upon the basis of his application, filed January 24, 1961, plaintiff is not entitled to either a period of disability under Section 216(i) of the Act, or to disability insurance benefits under Section 223 of the Act. For plaintiff to prevail, the evidence must establish that he was under a "disability", as defined by the Act, beginning on or before December 31, 1958, when he last met the special earnings requirements. Thus, the only issues for decision by the Secretary were whether or not the plaintiff was entitled to a period of disability and to an award of disability insurance benefits under the Act. These were dependent upon specific findings and they were resolved against the plaintiff. The plaintiff, feeling aggrieved by the Secretary's decision, brought his case before this court, as he had a right to do, and the Secretary has certified a transcript of the record here as prescribed by law. The Secretary having moved for summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the court will now address itself to that motion.

■ For a claimant to receive benefits under Section 223(a) (1) (D) of the Act, he must establish that he was under a disability at the time of the filing of his application therefor, and the last sentence of Section 223, subsection (c) (2) of the Act puts upon him the ultimate burden of proving his claim in these words:

"An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

The courts have given general recognition to this requirement by holding that the burden of proof is on the claimant to establish his claim with creditable evidence. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964); Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962); Kerner v. Flemming, 283 F.2d 916, 921 (2d Cir. 1960).

The Secretary, as the trier of fact, by rejecting the claim, necessarily found that the plaintiff had failed to carry the burden thus cast upon him by law. The plaintiff, by this review, seeks a reversal of that decision.

■ A further reference to the Act will disclose that the authority of the court is somewhat circumscribed by this provision therein:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

Nevertheless, it is said that this provision of the law does not contemplate that courts should surrender their "traditional functions," but, instead, that they will view the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the finding is supported by substantial evidence and to see to it that the administrative agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir. 1962); United States v. Certain Interests in Property, et al., 296 F.2d 264 (4th Cir. 1961); Pruitt v. Flemming, 182 F.Supp. 159, 161 (S.D.W.Va.1960).

Thus, it is seen that in its review of the decision of the administrative agen-

cy, the ascertainment of the meaning of the statutory term "substantial evidence," as it relates to cases of this sort, is all-important. It has been defined innumerable times as meaning more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. For further guidance in this regard, we find that a similar provision appears in the National Labor Relations Act, and in construing its meaning there, the Supreme Court, in Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126, defined the term, "Substantial evidence" as meaning such relevant evidence as a "reasonable mind might accept as adequate to support a conclusion"; and the same court, in National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660, Point 4 of the Syllabus, elaborated upon the meaning of the term thusly:

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

This definition was found to apply to the term as used in the Social Security Act in Pirone v. Flemming, 183 F.Supp. 739 (S.D.N.Y.), affirmed by the Second Circuit in 278 F.2d 508.

It is fundamental that in considering a motion to strike the plaintiff's evidence, and direct a verdict for the defendant, the court is guided by what its action would be if a verdict were returned for the plaintiff, and a motion made for a new trial on the ground of insufficient evidence. It is axiomatic that if there is a material conflict in the evidence, or if more than one reasonable inference can be drawn from the undisputed facts, the case should be submitted to the jury.

Thus viewed, the rule given in Utica Mut. Ins. Co. v. Rollason, 246 F.2d 105 (4th Cir. 1957), on a motion to set aside a verdict, is pertinent here:

"Our inquiry is not whether there was evidence to support a result contrary to the jury's verdict, but whether there was evidence legally sufficient to support the verdict that was found."

■ So it is here. The inquiry is not whether there is evidence to support a conclusion different from that reached by the Secretary, but whether there is substantial evidence to support the conclusion he *did* reach. We are not here concerned with whether we might have drawn a different conclusion from the evidence had we been the trier of fact, for such is not properly within our sphere of authority under the limitation imposed upon us by the statute. Under this limited authority, we are confined to an ascertainment from an impartial examination of the record of whether or not the decision of the Secretary, on the basis of the evidence before him, comports with reason and logic.

■ In making this determination, however, it must be borne in mind that the Congress, in amending the law to provide benefits to those becoming disabled from engaging in gainful activity, recognized the existence of social and economic needs that made such legislation desirable. Its obvious purpose was the attainment of a beneficent result and to reach an humanitarian end; and, like all remedial legislation, it should be liberally construed, interpreted and administered that it may accomplish the results intended. Pruitt v. Flemming, supra; Carqueville v. Folsom, D.C., 170 F.Supp. 777; Willard v. Hobby, D.C., 134 F.Supp. 66.

But, however wholesome the purpose and intent of the legislation may be, still the burden of establishing a claim under it is left to rest upon the one who asserts it, and no rule of liberality will take the place of required proof. The award of benefits cannot, therefore, rest .

upon imagination, speculation, conjecture, or sympathy—only creditable proof will suffice.

The courts appear to be in general accord that where there is a conflict in the evidence, or where conflicting inferences may be drawn from established facts, it is the proper function of the administrative agency to resolve the same, and his decision will be upheld by the courts. Thomas v. Celebrezze, supra; Gotshaw v. Ribicoff, 307 F.2d 840, 845 (4th Cir. 1962). And this is true even though there is but a "slight preponderance of the evidence on one side or the other." Underwood v. Ribicoff, supra; United States v. Certain Interests in Property, et al., supra.

The type or degree of disability we are here concerned with is defined by Section 223, subsection (c) (2) of the Act as follows:

> "The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

Broken down, it is clear that by this definition, for a claim to be established thereunder, the evidence must disclose:

(1) A physical or mental impairment medically determinable as such;

(2) The impairment thus found must be of such severity as to preclude engaging in any gainful activity;

(3) It must reasonably be expected to either result in death in the foreseeable future; or

(4) Be of such permanent nature as to reasonably be expected to continue for a long and indefinite (unforeseeable) duration.

The definition, as it is seen, comprehends a medical finding that the impairment is of such severity and permanency as to preclude the claimant from engaging in any gainful activity, now or in the foreseeable future. Under-

wood v. Ribicoff, supra; Gotshaw v. Ribicoff, supra; Pearman v. Ribicoff, 307 F.2d 573 (4th Cir. 1962). But in the actual application of the law, it was found that while a given impairment in one individual, with little or no versatility, would preclude him from engaging in any gainful activity, the same or similar impairment in another individual, possessing a greater aptitude, would not. So the courts, in order to give a practical effect to the law, by a series of decisions, have determined that once an impairment is medically shown, a more comprehensive inquiry must be made and that other factors, such as work history, education, skills or the lack of them, age, and job opportunity, are to be taken into consideration in order to reach a total and correct evaluation of the case. Thomas v. Celebrezze, supra; Bradey v. Ribicoff, 298 F.2d 855, 858 (4th Cir. 1962); Underwood v. Ribicoff, supra; Kerner v. Flemming, supra; Varnado v. Flemming, 295 F.2d 693 (5th Cir. 1961).

Therefore, for this court to properly resolve the question presented by this review, it becomes necessary to analyze and weigh the evidence in the broader sense to determine if it is sufficient to support in a persuasive and practical way the administrative decision. This will now be undertaken.

Plaintiff claims in his application that the onset of his disability began December 15, 1955, the result of a "broken back & skin grafts."

The record shows that he had previously filed an application on November 18, 1955 to establish a period of disability, alleging that he became unable to work on February 15, 1952, because of a broken back, which "has not been fully repaired." This application was denied on 9-22-56 and no request for reconsideration being made, it became final six months thereafter. Accordingly, that application is not in issue here.

The record further discloses that plaintiff was born February 10, 1925 and completed the eighth grade in school.

He began working in the coal mines in 1946 and this work has constituted his principal employment. His last work in this employment was about March, 1953. He was then working primarily as a coal cutting machine operator. He has had no on-the-job training in any type of work.

On February 15, 1952, plaintiff sustained a broken back when he was "rolled on a belt line." He was hospitalized and after about seven months he went back to work in the coal mines, operating a coal cutting machine. He stopped working about 3-15-53 when his back became so painful he could not continue in his work. In 1954, he worked for a lumber company stacking lumber for about five months. In 1955, he worked for a construction company about four months and for Appalachian Power Company four or five months, staking a right-of-way. He then worked about a year, June, 1960 to July, 1961, five days a week, for a dry cleaning company. In this job he drove a truck to pick up laundry and dry cleaning and worked as a spotter. He stated that altogether he missed about four months work out of the year he worked for this company. He said he quit this employment because of his painful back. He did some work for the State Road Commission from 2-28-61 to 3-31-61, helping burn brush, which he had to quit because of his back.

Concerning his impairments and present symptoms, plaintiff testified that he underwent an operation on his back in the Beckley Hospital about April, 1955, in which a bone graft was implanted. This bone graft broke and he underwent another operation in December, 1956. He claims to have pain in his back all the time which radiates down into his legs and up into his shoulders, accompanied by stiffness; that the operation left him weak in both legs, the left leg giving away at times; that two or three times a week he must sleep in a chair because of his back pain; and that he cannot get out of bed or dress himself without help. He takes aspirin regularly. He cannot drive a car because he must sit sidewise on the edge of a seat and is unable to sit back in a normal manner.

The record further discloses that because of the industrial injury of 2-15-52, the Workmen's Compensation Commissioner carried plaintiff on a temporary total disability basis to 9-28-52 and that he was thereafter determined to be totally and permanently disabled and was awarded lifetime compensation on that basis. He also draws compensation from the Veterans Administration, but the record does not disclose their findings as to percentage of disability.

The medical history begins with plaintiff's admittance to Stevens Clinic Hospital, Welch, West Virginia, where he was hospitalized from February 15 to February 25, 1952, for compression fracture dorsal 12 and mild compression of dorsal 11. He was followed in the outpatient department until September 29, 1952 at which time he was discharged to work. When seen on this latter date, there was spasm of the right erector spinae muscles but no evidence of pain on percussion over the fracture site.

Dr. M. M. Ralsten, of the Beckley Hospital, examined plaintiff on April 5, 1954 for Workmen's Compensation. At this time, plaintiff expressed complaints of more or less constant weakness and soreness in the upper back and under the shoulder blades. The doctor reported that he had previously seen the plaintiff on October 5, 1953 and since that time he had worked in a general store for three weeks but terminated this employment because of the symptoms. X-rays revealed wedging deformities of the eleventh and twelfth thoracic vertebrae with a mild kyphosis at this level. The joint spaces were fairly well preserved. The doctor recommended a spinal fusion.

A spinal fusion was done on May 11, 1954 in the Beckley Hospital, Beckley, West Virginia. Thereafter the plaintiff developed a pseudo-arthrosis which necessitated a revision of the fusion on December 14, 1955. According to the report, dated March 20, 1956, Dr. Ralsten

set forth that the plaintiff was convalescing and would remain under the hospital care for several months.

Plaintiff was examined on April 25, 1957 by Dr. C. W. Stallard, in the Laird Memorial Hospital, Montgomery, West Virginia, and presented complaints of thoracolumbar pain, dating the onset at the time of the industrial accident. The examination revealed generalized kyphosis of the thoracolumbar spine with incisional scars over the thoracolumbar area where two bone grafts had been inserted. The plaintiff had pain in attempting to hyperextend the spine. He flexed the spine satisfactorily and stooped fairly satisfactorily. X-ray revealed the body of D12 was moderately wedged anteriorly. Rehabilitative training was recommended and the examining doctor concluded that he did not believe plaintiff would ever be able to work in public works at heavy manual labor.

In a report dated 1-3-58, Dr. A. L. Jones, Medical Director of Huntington Orthopedic Hospital, found that straight leg bending of the right leg was good only to about 20 to 25 degrees of flexion; that plaintiff was unable to come to an erect sitting position with the knees extended; that there was increased lordosis and pronounced muscle spasm of the lumbar muscles, permitting only a small amount of lateral motion; that there was pronounced listing of the spine to the left; that forward flexion and hyperextension of the neck and shoulders caused pain and discomfort in the lumbar area; and that there were only moderate forward bending of the vertebral bodies in the lower dorsal area and pronounced kyphosis (abnormal curvature). In summary, Dr. Jones concluded that the plaintiff had considerable muscle spasm of the lumbar muscles and very little motion was permitted. He felt that plaintiff should not endeavor to return to work inside the mines and that he considered him 86% permanently disabled.

Dr. Irvin Saunders, in his report of 2-11-58, found evidence of marked limitation of lateral flexion of both right and left legs and a moderate limitation in rotation of the spine to the right and left and forward flexion was limited to 25 degrees and non-segmental in the lumbodorsal area (area of fusion operation). He also found evidence of extreme weakness and pain on straightening up from a bent-over position of only 25 degrees. From his findings, Dr. Saunders concluded:

"It is my opinion that this man's complaints are real and supported by the objective findings. Under these premises, with all factors considered, it is further my opinion that he is unemployable for manual labor in and about the mines, and therefore, feel it incumbent on me to recommend or estimate that he has sustained an 86% permanent partial disability as a result of the above described injury of February 15, 1952."

Dr. Harold H. Kuhn examined plaintiff on 11-3-58 and reported spinal motion carried out 30°, extension 10°, and lateral flexion to right and left 15° each. His X-rays did not reveal "solid fusion" of dorsal 12, and he concluded plaintiff was totally and permanently disabled.

Plaintiff was seen on 9-6-61 at Grace Hospital, when a diagnosis of osteoarthritis, cervical and dorsal-lumbar spine was made, accounting for the subjective pain. The condition was found to be static and activity was shown as "limited."

Dr. R. C. Hatfield saw the plaintiff on September 14, 1961 and gave as his impression old compression injury of spine at D–11 and 12; arthritis of spine; old operative scar over dorsal region of spine and each hip where bone grafts were removed; impaired vision; hypertension; and chronic severe constipation. Under remarks, Dr. Hatfield set forth:

"This man could not work at anything that would require stooping— forward, backward or lateral bending of spine."

The last examination of record was done on November 14, 1961 in the Vet-

erans Administration Hospital Clinic, Huntington, West Virginia. At the time of the examination, it was stated that plaintiff appeared in *acute pain* due to his back condition. The posture was poor due to dorsal kyphosis. When plaintiff was asked to demonstrate motion of spine, it was noted that he could not bend backward or laterally. Forward bending was limited to 10 degrees.

It is to be noted from this resume of the medical evidence that there is no significant conflict in the clinical and X-ray findings of the several doctors who have had an opportunity to examine and treat the plaintiff, and at least five of them were in agreement that he was unable to do manual work. Of these, Stallard, Jones and Kuhn are orthopedic specialists, peculiarly qualified to evaluate the effect the bone damage to the back would have on plaintiff's ability to work. Perhaps more significant, however, is the fact that of all the doctors who examined plaintiff, not one of them reported him able to work.

 While we recognize the rule laid down in United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617, that it is for the trier of fact, not the doctors, to resolve the ultimate issue—disability within the meaning of the statute—their expert opinions, referred to above, on plaintiff's inability to bend forward, backward, or laterally; the extreme pain and weakness obvious to them when such physical movements were attempted; and the abnormal curvature (kyphosis) of the spine, are relevant to show his incapacity. Underwood v. Ribicoff, supra, and Thomas v. Celebrezze, supra. Here, we have the expert judgment of five physicians, three of whom are orthopedic specialists, who say that by reason of their findings on examination they believe the plaintiff is incapacitated for manual work. Their expert judgment is not met by any other expert judgment to the contrary, and while, as was noted in the Underwood case, this expert judgment may not be considered as "conclusive on the ultimate question of fact in issue; e. g.

Claimant's ability to engage in substantial gainful activity," it does, however, reflect their opinion of the severity of his impairments, the degree of their development, and his physical and mental capacity to resist or adapt to them. "It is a proper basis for an evidentiary inference on these matters," as the court noted in the Underwood case.

An impairment having been thus medically determined as disabling, the subjective evidence becomes important to see what effect such impairment has upon plaintiff's ability to earn a livelihood. From his testimony, we find that he is not equipped by education or special training to do clerical or other work not requiring considerable physical exertion. His principal work experience is entirely in the area of manual labor—coal mining—the performance of which entails stooping, bending and lifting, which he cannot do to any substantial degree. This type of work also calls for the use of considerable dexterity and agility, factors entirely absent in plaintiff in his impaired condition. The Hearing Examiner virtually concedes as much, but he would have one believe that there are other gainful activities open to plaintiff which he, in his residual physical capacity, is capable of performing to a substantial extent. The evidence fails to bear him out, however.

As was pointed out in Thomas v. Celebrezze, supra, it is not necessary that a claimant be "bedridden" to come within the statute. Neither is he required to negative, as a prerequisite to establishing a claim, every conceivable job opportunity, however menial it might be. Nor may the Secretary speculate theoretically or deal in abstract situations to create visions of job opportunities which practical experience dictates are purely illusory. Here, we are dealing with a human being who had a broken back that necessitated two surgical operations to repair. It is not clear it has been repaired. He asserts that he suffers constantly with excruciating pain from it. We know that pain is subjective and that an injury such as plaintiff received

is competent to, and usually does, produce pain. Indeed, pain is a characteristic of such injuries. Some of the medical witnesses, Dr. Saunders for example, specifically observed that the pain complained of appeared to him to be real. There is no evidence to the contrary, and the objective clinical and X-ray findings are proof consistent with it. Here, we have five physicians, three of them orthopedic specialists, who say plaintiff's back trouble renders him disabled for manual labor. There is no medical opinion to the contrary. Here, we know there is a great labor surplus, not alone in this area but throughout most of the nation as well. To say, therefore, that this claimant, impaired as he is for manual labor, with no specialized training for clerical or sedentary work, could go into the labor market and compete for a job with more able-bodied jobseekers, or that an employer would consider him for employment, in his debilitated condition, on equal terms with a more physically perfect applicant, seeking the same job, is unreal and contrary to human instincts and experience. In the realities of plaintiff's situation there is no room for theory and speculation.

The court finds itself in complete agreement with the logic expressed by Judge Sobeloff in the Thomas case, that in selecting their employees, "[e]mployers are concerned with substantial capacity, psychological stability, and steady attendance." Obviously, the plaintiff would not meet this standard. Equally obvious, also, is the fact that an employer, having a choice, would not select for substantial gainful work one who had already been found to be totally and permanently disabled under his state's workmen's compensation law in preference to one having no such handicap.

Therefore, finding as we do, that the evidence establishes a medically determinable impairment, the principles of the Underwood case apply; and considering the effect of such impairment, within the framework of plaintiff's work

history, education, age and job opportunities, it is found that the decision of the Secretary that no disability, as defined by the Act, was shown, is not supported by substantial evidence, and his motion for summary judgment is accordingly overruled, and judgment is given to the plaintiff for a period of disability and disability insurance benefits as applied for.