# Richmond

IDA V. HINTON, ADMINISTRATRIX OF THE ESTATE OF LIONEL
W. HINTON, DECEASED V. INDEMNITY INSURANCE
COMPANY OF NORTH AMERICA.

April 8, 1940.

Record No. 2197.

Present, All the Justices.

206

The opinion states the case.

*Harry H. Kanter, I. W. Jacobs* and *W. R. Ashburn,* for the plaintiff in error.

*W. C. Pender,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Lionel W. Hinton, on the evening of December 28, 1937, was struck and killed by an automobile owned by the James G. Gill Company, Inc., and driven by John Hodges. Mrs. Ida V. Hinton, in an action at law brought by her as administratrix of the estate of the decedent, her husband, against the James G. Gill Company, Inc., John Ball and John Hodges, for the death of her intestate, recovered a judgment for $7,500 and costs against the defendant, Hodges, alone.

. Plaintiff, being unable to effect a collection of the judgment against Hodges, instituted this action against the Indemnity Insurance Company of North America upon its contract for liability insurance covering the automobile driven by Hodges when Hinton was killed.

The pertinent clauses in the policy of insurance, setting out the extent of the coverage, are as follows:

"III. Definition of 'Insured.' The unqualified word 'insured' wherever used in coverages A and B and in other parts of this policy, when applicable to these coverages, includes not only the named insured but also any person while using the automobile and any person or organization legally responsible for the use thereof, provided that the declared and actual use of the automobile is 'pleasure and business' or 'commercial,' each as defined herein, and provided further that the actual use is with the permission of the named insured."

"Any and all provisions of this policy which are in conflict with the statutes of the state wherein this policy is issued are understood, declared and acknowledged by this company to be amended to conform to such statutes."

Relating to such coverage, Virginia Code 1936, section 4326a, provides, in part, as follows:

"No such policy shall be issued and delivered in this State, to the owner of a motor vehicle, by any corporation or other insurer authorized to do business in this State, unless there shall be contained within such policy a provision insuring such owner against liability for damages for death or injuries to person or property resulting from negligence in the operation of such motor vehicle, in the business of such owner or otherwise, by any person legally using or operating the same with the permission, express or implied, of such owner."

It is conceded that the use of the automobile, at the time of Hinton's death, was within the designation "pleasure and business," and that Hodges was not a person within any class as to which the insurance company contracted against liability.

The James G. Gill Company, Inc., is engaged as a wholesale distributor of coffee and tea. In this business, it owned and operated three trucks and fourteen passenger cars, of which the car, a Plymouth sedan, driven by Hodges at the time of the accident, was one.

The policy issued by the defendant to the Gill Company covered all of the above trucks and passenger cars. The passenger cars are kept in the possession of and in continuous use by the officers and salesmen of the company. The company, maintaining no garage, permitted its officers and salesmen to take the cars to their respective homes and to use them for their own business or pleasure after they had completed the business of the company.

The Plymouth sedan, driven by Hodges, was a car which the Gill Company had permitted John Ball, one of its salesmen, to select, but which was actually purchased by the company in its name. This car, over which John Ball had full possession and control, was used both in the business of the company and for the pleasure and convenience of the salesman.

John Ball, about twenty-two years of age, is the son of Ernest R. Ball, a vice-president, director and manager of the sales division of the Gill Company. Mr. Ball, Sr., had general supervision over that division and over the operation of the automobiles of the company. Young Ball lived at his father's home in Norfolk, and the car was kept there.

John Hodges, a college student between eighteen and nineteen years of age, and John Ball were close friends and had attended school together. John Hodges is the son of Dean W. T. Hodges of the Norfolk Division of the College of William and Mary. Young Hodges entered the College of William and Mary in Williamsburg in the fall of 1937. On account of a difference with his step-mother, Hodges did not reside in his father's home at Norfolk, and when he returned to Norfolk from Williamsburg, during the fall of 1937, he spent two week-ends each month at the home of Ball. He says he had spent such week-ends with the Balls from April or May, 1937, to the time of the accident, except

during a period of three summer months when he was at sea. At the time of the accident, he was spending his Christmas holidays at their home and had been there for a week.

Hodges testified that he had driven the car of young Ball on several occasions during the week preceding the happening of the accident. He mentioned two specific occasions, on one of which he took Mrs. Ball, wife of vice-president Ball, to the down-town section of Norfolk, in order that she might do some holiday shopping, and on another occasion, when, at the request of Mr. Ball, Sr., he took a negro employee from the Ball home to the employee's home in another section of the city. He said he had used the car at other times, but could not recall the specific occasions; and that it had always been with the consent of young Ball, and the consent of Mr. Ball, Sr., whenever the latter was present or knew that he was taking the car. He never asked Mr. Ball, Sr., for the use of the automobile, because he felt that he was perfectly welcome to its use.

Hodges said that on the evening of December 28th he arrived at the Ball residence about six p. m., in the car of Dean Hodges, his father, which car he had been using during the day; that Ball, Sr., when he came home that evening, commented on the fact that the Hodges' car was parked in front of his house; that, after Ball, Jr., came home, he, Hodges, took that car back to his father's home and left it there; that John Ball, by agreement, followed him in his Plymouth car and brought him back to the Ball home; that Mr. Ball, Sr., knew of that trip and its purpose; and that he then had dinner with the Ball family, composed of Mr. and Mrs. Ball, Sr., Miss Anne Ball and John Ball.

Hodges and young Ball had, prior to the dinner, made plans to go to a dance that evening, each taking a young lady. The young ladies lived in separate parts of the city. It was arranged that Hodges should take the Plymouth car, go and get his young lady partner and come back to the Ball home to pick up Ball, Jr.; and that then all three were to go after the latter's partner, and thence go to the dance. He testified that their plans to take the young ladies to the

dance that evening were discussed in the presence and hearing of Ball, Sr., at the dinner table; that, in accordance therewith, after dinner, he dressed for the dance, came downstairs, got the keys to the Plymouth car off the radio by the door in the living room where Ball, Jr., had left them, went out, got in that car, which was in the driveway behind Ball, Sr.'s car, and started on his trip; that Ball, Sr., who was then sitting in the living room, made no objection to his use of the car; and that Ball, Jr., had given him express permission to use it.

On the way to pick up the young lady whom Hodges was to escort to the dance, he struck and killed plaintiff's decedent.

In a discussion after the accident, on the same night, between Ball, Sr., and Dean Hodges, the latter said that Ball, Sr., told him that they were very glad to have young Hodges in their home with their son; that he had been very useful to them during the Christmas holidays; that they had once or twice asked him to take Mrs. Ball shopping; that they "were especially glad to have him on Christmas Eve and New Year's day, with the fact that John (Hodges) didn't ever take a drink and he and Jack (Ball, Jr.) would take a Christmas drink occasionally, and they didn't want to be driving the car;" and that they also had had young Hodges take their colored chauffeur home Christmas night.

Mr. Ball, Sr., called as a witness for the plaintiff, testified that he did not recall any conversation in his home, or at his dinner table, about the two young men going after the young ladies to escort them to a dance, and that he did not remember anything that was talked about that evening, and would neither deny nor affirm the statements of young Hodges. He gave the following testimony with reference to his knowledge of the use of his son's car by young Hodges:

"Q. You would have had no objection to his using the car since he was not a drinking boy, would you?

"A. Of course, conditions would govern that. I doubt seriously if I would have objected if he had asked me because he was a guest in my home."

John Ball, Jr., testified that he had the unrestricted use of the car assigned to him by the Gill Company. He confirmed the arrangements made with Hodges for the use of his car on the night of the accident. He would neither deny nor affirm that the car had been used by Hodges, on that occasion, with the knowledge of his father.

On motion of the defendant, the trial court, without exception from the plaintiff, instructed the jury to disregard the testimony of young Ball on the ground that it showed no permission to use the car from Ball, Sr., the vice-president of the Gill Company.

At this point one of the jurors conferred with the court and counsel for the parties, in the absence of the other jurors, and asked the following question:

"Juror: Is not the permission of an employee of the Gill Company, that is, the salesman, John Ball, all that is necessary under the policy?

"The Court: No. Permission of the salesman, John Ball, would not be sufficient."

There was no exception taken to this question or answer by counsel for either party.

In accordance with this ruling by the court, the jury was instructed, at the request of the plaintiff, that she was entitled to recover if the jury believed from the evidence that Hodges was operating the automobile "with the knowledge and permission, express or implied, of an officer of the James G. Gill Company, Inc.," when Hinton was killed. This instruction thus became the law of the case. We need not, therefore, give any consideration as to whether the permission of John Ball for John Hodges to use the Gill Company's car was sufficient to bind the insurance company.

The conversation between one of the jurors and the trial court with reference to the above-mentioned instruction leaves no doubt but that the juror understood that the permission required to justify a recovery must have come from an officer of the company.

The jury found for the plaintiff for the full amount claimed. The trial court set aside their verdict as being contrary to the law and the evidence.

The sole question for our determination is whether or not John Hodges was using the automobile of the assured, the James G. Gill Company, Inc., with the permission of the assured.

The evidence shows no express permission. Does it show an implied permission?

We are aware that a verdict which has been disapproved by the trial judge is not entitled to the same weight as one that has been approved by him; but if the evidence and circumstances are such that reasonable and fair-minded men may differ in their conclusion, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury. The weight of the verdict of the jury, when there is evidence upon which it can be based, in the absence of prejudice, partiality, or corruption, is not overborne by the disapproval of the trial judge. The question involved under such circumstances is a question of fact, which is left to the determination of the jury, and we are bound by their conclusion. *Thress* v. *Hackler*, 155 Va. 389, 154 S. E. 502; *Union Trust Co.* v. *Fugate*, 172 Va. 82, 200 S. E. 624.

The question of the grant or of the absence of permission to drive an automobile, when based upon conflicting evidence, is a question of fact for the jury. Permission may be shown by positive or circumstantial evidence. The jury may allow unimpeached circumstantial evidence to overcome opposed negative or questionable oral evidence, as it is their province to pass upon the credibility of the witnesses. *Union Indemnity Co.* v. *Small*, 154 Va. 458, 153 S. E. 685; *Ryan* v. *Maryland Casualty Co.*, 173 Va. 57, 3 S. E. (2d) 416; *Ellis* v. *New Amsterdam Casualty Co.*, 169 Va. 620, 194 S. E. 687.

Under the Virginia statute, the permission of an assured in a liability insurance policy, to bind the insurance

company, may be either express or implied. To be express, it must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference. On the other hand, the correlative word, "implied," as defined in Webster's New International Dictionary (2d Ed.), means "inferential or tacitly conceded." It involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent. An implied permission is not, therefore, confined alone to affirmative action.

In *Tomasetti* v. *Maryland Casualty Co.* (1933), 117 Conn. 505, 169 A. 54, 55, a case somewhat similar in its facts to the instant case, it was held that the word "permission," unqualified by the adjective "implied," in an insurance policy, is used in the sense of leave, license or authority. Such permission, said the court, "is not necessarily limited to that granted by arrangement between the parties or otherwise in definite, express terms. It may arise and be implied from a course of conduct, pursued, with knowledge of the facts, for such time and in such manner as to signify, and be compatible only with, an understanding consent amounting to a grant of the privilege involved."

▮ "The word 'permission' has a negative rather than an affirmative implication; that is, a permitted act may be one not specifically prohibited as contrasted to an act affirmatively and specifically authorized. That it appears in automobile policies would indicate that anyone having permission or color of authority is included within the clause. * * * " *Brower* v. *Employers' Liability Assur. Co., Ltd., etc.* (1935), 318 Pa. 440, 177 A. 826, 829.

Considering the evidence in the light of the foregoing principles, we find that John Hodges was a frequent and welcome guest in the Ball home, and that he had been there a week before the accident, being treated as one of the family. It is undenied that on December 28, 1937, Ball, Sr., came home, observed Dean Hodges' car in front of his house and commented on that fact; that after the return of

young Ball, Ball, Sr., was told that Dean Hodges' car was being returned to its owner; that, at the family dinner table, the plans of the two young men for the evening and the fact that they were escorting two young ladies, who lived in opposite parts of the city, were discussed in the presence of Ball, Sr.; that Hodges, on his way out of the house, went into the living room, where Ball, Sr., and his wife were sitting, and told them that he was going for the young lady who would accompany him and would then return for Ball, Jr.; and that, in their presence, he then took, from the top of the radio, the keys to the Plymouth car and left.

We say this is undisputed, since Ball, Sr., said that he did not recall or remember what took place when he came home that evening or what the two young men said or did, because he was paying no particular attention to them; and that he neither denied nor affirmed the statements of Hodges. He also said that they might have told him what they were going to do and he might have said, "O. K. Johnny. Goodbye."

Ball, Sr.'s, statement to Dean Hodges as to young Hodges driving the car on Christmas day is significant. Further significant is his answer to the question whether he would have objected to Hodges using the Plymouth car, in which he said, "Of course, conditions would govern that. I doubt seriously if I would have objected if he had asked me because he was a guest in my home." Finally, he testified that he did not know, at the time of the accident, that young Hodges was driving the car in question, although he had learned since the trial of the original case that he had been driving his son's car when the two of them were out together at night.

In reaching our decision, we are not troubled with any contested principle of law. The jury should not have had any difficulty in understanding the instructions of the trial court. The answer to the question involved is entirely dependent upon the weight of the facts and circumstances disclosed by the evidence. Did the jury, as fair-minded and reasonable men, have the right to conclude that John Hodges

had the implied permission of Ernest R. Ball, an officer of the Gill Company, to use the latter's automobile on the evening of December 28, 1937?

There are positive facts that Hodges had used the Plymouth car before the accident at the request of Ball, Sr.; that he had also used the car on a number of other occasions, and, whether it was with or without the knowledge of Ball, Sr., the latter indicated no objection; that Ball, Sr., welcomed Hodges in the former's household, both because of the young man's character and his ability to drive a car; and that on the night of December 28th, Ball, Sr., knew that Hodges had no car in which to go after the young ladies and thereafter to accompany Ball, Jr., to the dance other than one of those assigned to the Balls. In addition, we have seen the attitude of Ball, Sr., towards any use of the car by Hodges, an attitude indicating acquiescence and tacit consent. That the facts and circumstances gave notice of such use to a man of Ernest R. Ball's intelligence, measured by his responsible business position, is not an unfair or unreasonable presumption.

If Ball, Sr., knew all that John Hodges said he knew, he must have known that Hodges was using one of the cars at the Ball home on the night of December 28th. Ball's denial of such knowledge and his failure to remember the facts and circumstances, testified to by young Hodges, left the question of the credibility of the two witnesses to the jury. We are unable to substitute for the jury's conclusion a finding that Ball, Sr., had no knowledge of the use of the car by Hodges until after the accident.

In cases of this kind, circumstantial evidence is often all that can be supplied. It is in such cases that the services of a jury are valuable. In the normal affairs of human life, intelligent and impartial jurors are as competent as men trained in the law to draw proper inferences from and to give conclusions to the effect of circumstances. Here seven jurors have unanimously said that the facts and circumstances fairly submitted to them show an implied permission from Ball, Sr., for the use of the car by Hodges.

We cannot say that the verdict is contrary to the evidence, without evidence to support it, or a "plain deviation from right and justice." The evidence is not incredible or impossible.

For the foregoing reasons, we are of opinion the trial court erred in setting aside the verdict of the jury. Its judgment will be reversed, the verdict of the jury reinstated, and final judgment entered here for the plaintiff.

*Reversed.*