Lucy K. **MAZDRA**, Administratrix of the Estate of Richard F. Mazdra, Deceased, Respondent,

v.

**SELECTIVE INSURANCE COMPANY,** a Corporation, Appellant.

No. 51261.

Supreme Court of Missouri, Division No. 2.

Jan. 10, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 14, 1966.

Donald Gunn, Donald Gunn, Jr., Hyman G. Stein, Charles Alan Seigel, St. Louis, for respondent.

John D. Schneider, St. Louis, for appellant.

PRITCHARD, Commissioner.

This is a suit in equity to reach and apply bodily injury proceeds of appellant's automobile insurance policy to a judgment for wrongful death of respondent's intestate. Section 379.200, RSMo 1959, V.A.M.S. Separate actions in garnishment against appellant were ordered consolidated with said equity suit upon appellant's motion thereon, and the cases were heard as one according to the trial court's findings, and the judgment, reciting the consolidation, disposes of all issues "herein joined." The original default judgment for which appellant is said to be liable under its policy was for the amount of $25,000, and that amount

plus interest, $9,375, from the date of rendition thereof, July 24, 1958, to the date of the judgment herein appealed from amounts to a total of $34,375. The original judgment for wrongful death was granted against one Mary I. Hughes, the tort-feasor, who was driving a 1955 Pontiac sedan at the time of the occurrence, April 11, 1956, which resulted in the death of plaintiff's intestate. Appellant's policy of insurance was issued to Noel Wilson, the named insured. Appellant declined to defend the original tort action, and here resists imposition of liability under the policy upon the ground that said Mary I. Hughes was not afforded coverage under the "omnibus" provision of the policy in that she was not driving the named insured's automobile with his permission, express or implied.

The "omnibus" provision of appellant's policy extending coverage to others than the named insured is: "III(a) With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured and, if the named insured is an individual, his spouse if a resident of the same household, and *also includes any person while using the automobile* and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse or *with the permission of either.*" (Italics added.) There seems to be no contention that Mary I. Hughes had an express permission from Wilson to drive the Pontiac station wagon on the date of the collision. The issue is, and our review is concerned with, whether or not there was sufficient and substantial evidence adduced from which there exists a *legitimate inference* of Wilson's permission (i. e., an implied permission) to Mary that she could drive the station wagon. Varble v. Stanley, Mo.App., 306 S.W.2d 662, 667 [8]. The evidence conflicts considerably with respect to a course of conduct of Wilson, the named insured, and Mary as it concerns the driving by Mary of the automobile.

Wilson operated an ornamental iron and fire escape fabrication business from his residence, and a shop to the rear thereof, located at 18th and Lynch Streets in St. Louis, Missouri. Prior to the occurrence in question he was separated from his wife, and upon occasions he had the custody of his three minor children in his home. According to witness Willis W. Pearson, who resided just behind Wilson, and who worked for him in welding iron in the shop, Mary was at Wilson's home taking care of the children and acting as his housekeeper. She also would bring telephone messages from the home to the shop, and bring out hot coffee to the men. Pearson testified that he saw Mary driving the subject 1955 Pontiac station wagon in the presence of Wilson. He testified: "I saw her driving that station wagon ever since he had got it, it was new, she was buzzing around in it practically daily to my knowledge and on several occasions she had used the station wagon and drove us out in the field and picked us up after work." Pearson testified further that he didn't hear the man (Wilson) tell her that "here's the keys and take the car," but he saw her driving during the winter of 1956 and up to April 11, 1956.

A copy of Wilson's statements given appellant's claims investigator attached to its answer as a part thereof (not objected to by respondent) shows that Mary worked for him and at no time had she permission to drive his car; there was no need for her to drive his car in the course of his business; she was employed to look after the office, do typing and answer the telephone when he was away. By a supplemental statement, Wilson stated that on the day of the accident and on all other days on which he was away from 1301 Lynch, he left a set of car keys with Mary Hughes, his employee. The keys were on a ring with his garage keys. He used the garage as a workshop. He left these keys with her in case she had to leave and she could lock up the place when he was gone. The other set of keys was with him on the job the day of the accident. Wilson's deposition given in anoth-

er case was read in evidence. (Such deposition, although objected to during the trial, is here used by both parties.) Therein Wilson testified that Mary worked for him six months until August or September, 1956. At the time of the accident she was not on his official payroll, but was working, looking after the children and answering the telephone. She was driving the automobile at the time of the accident, and the best he could say about how she happened to be driving it was the fact that she had the keys. "They were on a chain along with my house and shop keys, see? Now, why she had those is, I had a double set of all keys, and I might send someone to the shop for some material or something, so it was better that she had the keys and she could let them in. That's how she came to have them." Further he testified, "Q. Now, you had given those to her? A. Well, I laid them on the dresser. Q. On the dresser in the house so that she could take them? A. So if someone came there to the shop, they could get in. Q. In other words, she was staying with you at that time? A. No, just days. Q. I mean days. A. Yes. Q. She had access to the house, in other words, to the dresser? A. Yes; that's where the 'phone was. See, there's a 'phone in the house; there's a 'phone in the shop behind the house. * * * Q. So these keys were left on the dresser for her use? A. Well, not particularly for her use; for anyone's use who come and wanted to get in the shop.

* * * Q. She had driven that car on previous occasions, had she not? A. Not to my knowledge. I didn't know she could drive or anything. * * * Q. Did you own a station wagon at one time? A. I own a station wagon now. That's what she had the wreck in. Q. Oh! Now, didn't she drive that station wagon on previous occasions to this? A. Not to my knowledge."

Mary I. Hughes, the driver of the Pontiac station wagon, testified that she went to work for Wilson on March 23, 1956, having perviously worked in a tavern as a barmaid where she met Wilson. Her duties were to watch Wilson's children and to take care of the telephone; they did not include driving the car. Prior to April 11, 1956, Wilson gave her permission to drive the station wagon, and she did drive it both with and without his permission. With respect to her statement given appellant's investigators, in which she stated she took the automobile without her employer's permission, she testified further: "I was talking purely about that day. On that day he did not have no idea, no knowledge, no nothing, of me taking that car and that is the truth. A couple of times we had been out together and he would give me the keys, and he would be busy and I would have to go to the grocery and he would say, 'You take the car and go to the store and get the groceries,' little things like that, but on this day, the day the accident happened, he had no knowledge that I had the car at all." After the accident Mary continued her employment with Wilson. They were married on October 4, 1957. On cross-examination by respondent she testified: "Q. On occasions prior to April 11, 1956, did you drive Mr. Wilson in the car? A. I couldn't tell you whether it was before or after because I didn't quit driving the car after the accident only it took me some weeks to get some nerve up. * * * Q. From the time you went to work for Mr. Wilson you did drive the Pontiac automobile? A. Well, I drove it before the accident, yes. Q. You drove it regularly? A. No, I didn't drive it regularly. Q. You said you used it to go out and pick up groceries? * * * A. I don't know if it was before or after it, that is, the only time we had to worry about groceries was when the children were there." On the day of the collision, Mary took the automobile to the Stork Tavern to visit her friends, and it was on the return trip that the accident happened.

Although it is true, as contended by appellant, and stated in the Varble case, supra, that a person claiming an implied permission from an owner to drive his automobile must prove it, and that no implied permission can arise merely because someone ob-

tained possession of the property and used it without the knowledge of the named insured, yet such permission may originate in the language or conduct of the named insured. Hanover Insurance Company v. Abchal, Mo.App., 375 S.W.2d 605, 608 [1–4] ("Usually, an implied permission arises from a course of conduct of the parties over a period of time *prior* to the use in question. Alabama Farm Bureau Mutual Casualty Insurance Company v. Robinson, 269 Ala. 346, 113 So.2d 140"). See also 7 Am.Jur.2d Automobile Insurance § 113, p. 425; Annotations: 72 A.L.R. 1398; 126 A.L.R. 550; 160 A.L.R. 1202; 5 A.L.R.2d 610; 7 Appleman, Insurance Law and Practice, § 4365, p. 300; 6 Blashfield, Cyclopedia of Automobile Law and Practice, § 3943, p. 614.

■ Under appellant's Point I(A), by which it contends that there was no substantial evidence to support a finding that the use of the automobile was with the permission of the named insured, it is first argued that no permission can be implied from usage of the car without the insured's knowledge. The cited case of Nye v. James, Mo.App., 373 S.W.2d 655, 661, had the issue of knowledge (held lacking) of the named insured through equivocal testimony of her divorced spouse who had taken possession of the automobile and delivered it to his cousin for repair. Thereafter, one member of the family drove it at the time of plaintiff's injuries. In Varble v. Stanley, supra, there was a lack of evidence that the named insured had any knowledge that the vehicle was being driven by the tort-feasor. [It was said in that case, loc. cit. 306 S.W.2d 667, by way of partial dictum, "If the evidence showed that the father was in the sight and vicinity of the car when the boy left with it, we would have a situation which might call for reasonable deduction that the father, at least impliedly, assented to the taking, but we have no right to infer it from the facts shown here."] In Hanover Insurance Company v. Abchal, supra, loc. cit. 375 S.W.2d 609, it was held that Abchal, the tort-feasor, had never used any

automobile or the insured vehicle with the permission of the named insured, and that there was nothing in the dealings or association of the two that would justify implying that Abchal had permission to use the vehicle for his own personal use or social purposes for a period of several weeks while the named insured was on vacation. Undoubtedly, as appellant contends, there must be knowledge of the facts in order that there may be acquiescence of a named insured which would give rise to an implied permission of another to use an insured automobile. 45 C.J.S. Insurance § 829c(2), pp. 897–898. The fallacy, however, of appellant's argument is that there is evidence in the case that not only did Wilson give express permission for Mary to use the Pontiac on occasions (by which he must have had knowledge that she drove it) but also that she drove it in his presence ("I saw her driving that station wagon ever since he had got it, it was new, she was buzzing around in it practically daily"), from which it may also be inferred that he had knowledge that his automobile was being driven by Mary. It is not a case of Mary obtaining possession of Wilson's vehicle without his knowledge, and the Nye, Varble and Hanover cases, supra, are therefore inapplicable.

■ Appellant next argues that the testimony about Mary using the car to get groceries, or driving Wilson (and Pearson) to and from their work, raises no implication except that she had permission to use the car at such times as she was instructed by Wilson, and for his business. In 45 C.J.S. Insurance § 829, at page 900, the statement is made, "In the absence of express consent to an employee to use his employer's car, an implied permission or consent extends only to its use within the scope of the employment, apart from slight deviations, unless there has been a permission to use the car generally or a course of conduct or a practice with the owner's acquiescence, reasonably indicating the employee's right to assume permission in the particular circumstances." Although Mary,

when she testified for appellant at the trial, was not asked as to what personal use she made of the Pontiac when "she was buzzing around practically daily," yet the reasonable implication is that she was using it for personal missions—she could not be *always* using the car for Wilson's business. There was no evidence of any prohibitions or restrictions upon her driving. Compare American Casualty Co. of Reading, Pa. v. Windham (D.C.Ga.), 26 F.Supp. 261 (aff'd CCA 5th, 107 F.2d 88), where there was testimony, held to be improbable, of a prohibition on driving beyond a county, the court saying there was no express limitation of use, and at loc. cit. 26 F.Supp. 263 [4], "In the absence of express prohibition, permission to use car may be implied. (Citing cases)." Thus an inference could be made that Mary had permission to use the Pontiac generally and not only when instructed by Wilson, and for his business, the latter of which obviously would be an express permission. The course of conduct here between Wilson and Mary, to be found from the trial court's determination of conflicting testimony and the credibility thereof (on testimony before the court as against a deposition and extrajudicial statements), is sufficient for the finding that there was an implied permission from Wilson to Mary which would give her coverage under said "omnibus" provision of appellant's policy. That course of conduct is to be found from the following: Mary drove the Pontiac practically daily in Wilson's presence, both with and without permission; on occasions, he gave her express permission to drive the automobile for his business; a set of keys was accessible to her; there were no prohibitions or restrictions placed by him on her driving; and despite his testimony to the contrary, as contained in his deposition, the facts are ample to show that he had knowledge of Mary's prolonged, frequent and habitual driving prior to the accident, and that he acquiesced therein. Tomasetti v. Maryland Casualty Co., 117 Conn. 505, 169 A. 54.

A further argument made by appellant is that any interpretation other than that Mary had permission to drive the car only when she was given express permission to do so takes flight upon her testimony that she did not have permission to use it at the time and place of the accident. That argument might be valid if it were the only evidence on the subject of express *or implied* permission. Her testimony, being a conclusion of the ultimate fact of permission, express or implied, was not binding upon the court, and the other evidence, tending to show an implied permission, did not take flight upon her testimony. Raw v. Maddox, 230 Mo.App. 515, 93 S.W.2d 282, is not in point.

Appellant's Point I(B), that "The use made of the automobile was for a social purpose, which was a marked deviation from any permission that could, arguendo, be implied," is without merit for this reason: This is not a case of deviation from an employee's prescribed use, or that of a single, specified use from which there was a deviation. Appellant's cited cases of Speidel v. Kellum, Mo.App., 340 S.W.2d 200; Farmers Mutual Automobile Insurance Co. v. Noel (W.D.Mo.), 211 F.Supp. 216, and others espousing the "minor deviation" rule, are not in point. This case is one where the driver, Mary, had a continuous implied permission to make use of the automobile for her own purposes. On the day of the accident she was not on any mission of her employer. Point I is ruled against appellant.

In its reply brief, appellant denominates as "New Matter" the fact that respondent did not join Mary I. Hughes as a party defendant. The contention, here raised for the first time, is that she is an "indispensable party" to the proceedings. The argument is that said § 379.200 makes her so by the words, " * * * the judgment creditor may proceed in equity against the defendant *and* the insurance company * * *." (Italics ours.) We deem that Mary I. Hughes is not an indispensable par-

ty in the sense that her rights are affected by the instant consolidated suits. The judgment against her of July 24, 1958, was final, and her liability was established thereby. The case of Rutherford v. National Indemnity Co., D.C.Mo., 113 F.Supp. 640, at page 641 [3], had this issue. It was there said, "The Homan case is also authority for our holding the insured is not a necessary party. Plaintiff already has a judgment against him. We cannot anticipate any relief that could be accorded plaintiff in this action against the policy holder, except to let any money recovered in this action show as a credit on the original judgment. Since the original judgment was obtained in this court that detail can be provided for, in case of a recovery by the plaintiff in this action. Motion to dismiss is Overruled." We do not find the issue ruled in the Homan case referred to [Homan v. Employers Reinsurance Corporation, 345 Mo. 650, 136 S.W.2d 289, 127 A.L.R. 163], but the reasoning in Rutherford is sound. Appellant here suggests that the rights of Mrs. Hughes can be materially affected by the outcome of this suit, but does not suggest how her rights could be affected. The case of Shepherd v. Department of Revenue, Mo.App., 377 S.W.2d 525, 527 [3], discusses and defines the term "necessary party." The issue here is whether appellant is liable to pay the judgment against Mary I. Hughes, whom we have held above to be an insured covered by appellant's policy. She was not necessary or indispensable to the proceedings below because the judgment adjudicating appellant's liability could have been rendered without her presence as a party. Since she is not a necessary or indispensable party, appellant cannot raise the objection for the first time on this appeal. Shepherd v. Department of Revenue, supra, loc. cit. 377 S.W.2d 528 [4, 5]. This issue is ruled against appellant.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.