Karen E. BOURNE, a minor, by her mother and next friend, Dorothy W. Bourne, and Joe Bourne and Dorothy W. Bourne, Plaintiffs-Respondents,

v.

Sandra MANLEY, Administratrix of the Estate of John W. Manley, Jr., deceased, and Linda Bradshaw, Defendants,

MFA Mutual Insurance Company, a corporation, Garnishee-Appellant.

No. 8807.

Springfield Court of Appeals.

Missouri.

Dec. 4, 1968.

Elroy S. Thomas, Buehner & Thomas, Joplin, for garnishee-appellant.

Douglas & Douglas, Neosho, for plaintiffs-respondents.

STONE, Judge.

Garnishment. Upon trial in the Circuit Court of Jasper County on April 25, 1967, Karen E. Bourne, a minor, and Joe Bourne and Dorothy W. Bourne, her parents, as plaintiffs, obtained a judgment in the aggregate sum of $44,500 against Sandra

Manley, Administratrix of the Estate of John W. Manley, Jr., deceased, and Linda Bradshaw, as defendants, for damages arising out of injuries sustained by plaintiff Karen in a vehicular collision about 1 A.M. on March 10, 1966, near Joplin, Missouri, involving a 1962 Ford automobile owned by Laurence Bradshaw and Mrs. Pauline Bradshaw, and being driven at the time of accident by their daughter, defendant Linda then sixteen years of age, in which plaintiff Karen was riding as a passenger. An automobile liability policy of MFA Mutual Insurance Company, issued to Laurence Bradshaw as the named insured and in effect on the date of accident, obligated MFA Mutual to "pay on behalf of the insured all sums [within the policy limits of $10M/$20M/$10M] which the insured shall become legally obligated to pay as damages" because of bodily injury or property damage "caused by accident and arising out of the ownership, maintenance, or use of the described automobile," to wit, the 1962 Ford. That portion, here material, of the so-called omnibus clause of the policy provided that "the following are insureds . . . with respect to the described automobile, (1) the named insured and, if an individual, his spouse, (2) any other person using such automobile with the permission of the named insured or his spouse, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission . . . ."

Acting under a general execution issued on the aforesaid judgment, plaintiffs initiated this garnishment proceeding against MFA Mutual, as garnishee. Rule 90; Chapter 525. (All references to rules are to the Supreme Court Rules of Civil Procedure, V.A.M.R.; and all statutory references are to RSMo 1959, V.A.M.S.) The sole issue in the jury-waived trial in the garnishment proceeding was as to whether or not defendant Linda was, at the time and place of accident, using the Ford with the requisite permission. After taking the case under advisement, the trial court

filed a written memorandum, in which he concluded "that the use of the car on the night of the accident was with the permission of Mrs. Bradshaw." On the same day, judgment was entered in favor of plaintiffs Bourne and against garnishee MFA Mutual in the sum of $10,000, garnishee's maximum policy liability for bodily injury to one person, and in the additional sum of $142.-22, the court costs in the damage suit. Upon this appeal by garnishee, we have appellate jurisdiction because the amount in dispute, exclusive of costs, is less than $15,000. Art. V, Secs. 3 and 13, Const. of 1945, V.A.M.S.; § 477.040; McGarrah v. Stockton, Mo.App., 425 S.W.2d 223, 225 (1).

It is not clear whether the trial court's judgment rested upon a finding of *express* or *implied* permission, and on appeal counsel for plaintiffs-respondents simply assert that defendant Linda "had *either express or implied permission.*" (Except as is otherwise specifically stated, all emphasis herein is ours.) There is no doubt but that permission under the omnibus clause may be either express or implied from the conduct of one authorized to give it [Varble v. Stanley, Mo.App., 306 S.W. 2d 662, 666(4); Hartford Acc. & Indem. Co. v. List, Mo.App., 424 S.W.2d 761, 767], and that the judgment nisi should be affirmed if the trial court properly could have found for plaintiffs on either theory. Morris v. Western Cas. & Sur. Co., Mo.App., 421 S.W.2d 19, 21(1); Service Construction Co. v. Nichols, Mo.App., 378 S.W.2d 283, 290(12). Because of this and also because of the question as to the credibility of garnishee's witnesses, namely, defendant Linda and her mother, suggested by the trial court's memorandum (of which more anon), at the risk of painful tedium we enter upon an unusually detailed factual review including numerous testimonial excerpts.

At the time of accident, Linda's mother operated four rooming houses for college boys at Pittsburg, Kansas. Whether the

Bradshaws lived in one of those houses was not shown in evidence, but it was established that the family was domiciled in Pittsburg. Although the record does not disclose the names and ages of all members of the Bradshaw menage, we do know that Linda lived with her mother and, from various testimonial fragments, it is fairly inferable that, on and prior to the date of accident, the husband and father Laurence Bradshaw, as well as a son Larry of legal driving age and other younger children, also resided in the same household. However, the import of the evidence is that the major responsibility for supervising and rearing Linda had fallen upon and had been assumed by her mother. Within the year after the accident under consideration, Mr. and Mrs. Bradshaw were divorced; and he did not testify at the subsequent trial in the garnishment proceeding.

Plaintiff Karen and defendant Linda became friends in 1964, their freshman year in high school, when the Bradshaws moved to Pittsburg. During a portion (not fixed in evidence as to dates or duration) of the subsequent period to the time of accident in March 1966, the Bradshaws lived in St. Paul, Kansas, a small town some thirty-two miles northwest of Pittsburg; and on at least one occasion Karen visited Linda there. Mr. Bradshaw had employment (the nature of which was not disclosed) and drove his pickup "almost exclusively," so the 1962 Ford was left at home most of the time. To the evidence bearing upon Linda's use of that automobile, we now attend.

When the Bradshaws came to Pittsburg in 1964, they had the 1962 Ford and also a 1957 Ford. According to *plaintiff Karen,* defendant Linda "drove both cars quite frequently" until the summer of 1965, when the Bradshaws sold the 1957 Ford. Thereafter, she (Karen) had seen Linda drive the 1962 Ford "regularly" and "on many different occasions" and sometimes had ridden with her in that automobile. On "the Sunday before Labor Day" 1965 (apparently while the Bradshaws were resid-

ing in St. Paul), Karen accepted the invitation of Mrs. Bradshaw "to ride over to St. Paul to see Linda." On that occasion, Linda told her mother "we are going for a ride" and the two girls left in the 1962 Ford. Karen also testified that she knew "of two occasions for sure" when Linda had driven the 1962 Ford to St. Paul—"she just told me she had driven the car over." Having dropped out of high school after three months of her junior year, Linda was not in school in 1966 but "was baby-sitting for some people around town." During that period, Karen was still in school so "I didn't see her [Linda] . . during the day, but I did see her of an evening driving the car [the 1962 Ford]." The question, "to your knowledge did she [Linda] have use of the [1962 Ford] every time she wanted it," elicited Karen's unqualified affirmative response, "yes."

*Plaintiff Joe Bourne,* Karen's father, testified: "Q. Had you ever seen Linda driving the [1962 Ford] in Pittsburg? A. Numerous occasions. Q. Over how long a period of time? A. Well, from the time probably that she and Karen started running around until this accident . . . . A couple of years anyway . . . . Q. And during that time to your knowledge did Linda drive it regularly? A. Yes, sir." *Plaintiff Dorothy W. Bourne,* Karen's mother, stated that she had seen Linda driving the 1962 Ford over a period of "at least a year, two years—quite a long time," and that, when Linda came to the Bourne home, "she had the [1962 Ford] and drove it; she came up in the car when she came up there; she rarely walked up there, although they lived close; she usually came in the car."

*Defendant Linda,* sixteen at the time of accident and eighteen when the case was tried on November 14, 1967, admittedly had driven the 1962 Ford on "many different occasions." Denying that she "had the use" of the 1962 Ford whenever her mother was not using it, she said that "if [mother] thought that I should have it she would let me have it." Linda readily

agreed that when, upon trial of the *damage suit,* she had been asked "I take it you had the use of this [1962 Ford] whenever it was available there because it was your mother's car, [am I] correct on that," her response was "when she wasn't using it." In the *garnishment proceeding,* she tendered the explanation that "what I meant" was "daddy didn't need the car so mother and I had access to the car; it wasn't as if daddy took it off to work with him." At one point in her testimony, Linda stated that her use of the 1962 Ford was "just when I went on [mother's] errands," but shortly she offered the more detailed commentary that, after the Bradshaws sold the 1957 Ford, "I would drive the '62 [Ford] . . . when mother wanted something done and I would say about five times out of all that time I got to take it out for enjoyment." According to Linda, she had not driven the 1962 Ford without prior parental permission until she secretly had a key (hereinafter referred to as the extra key) made "approximately a month before the wreck." Thereafter, she had (so she said) sometimes employed the extra key to drive without parental permission or knowledge. When counsel sought to determine the nature and extent of such alleged usage, Linda's answer on direct examination was, "I can just remember one time in particular . . . but I know I did." On cross-examination she first thought "I had driven it twice without my mother's permission that I could remember." And later she elaborated in this fashion, "not many different times . . . two distinct times I remember and before that or during that just several times . . . during that month, I would say less than once a week, once every two weeks, it seems like more to me." However, Linda did not always use the extra key when she took the 1962 Ford. E. g., "I think the night before [the accident] I went to talk to a priest and I asked mother for her key . . . ."

*Mrs. Pauline Bradshaw,* Linda's mother, testified that, after she had "leg surgery" requiring seventy-six sutures in April 1964, "I had Linda to do my errands, go back and forth and help me, and I have given her permission to drive on occasions like that but I have been pretty strict on account of my being fully responsible on all the responsibilities."[1] The 1962 Ford had been left at home for the use of Mrs. Bradshaw and for Linda to "run errands" but "definitely not" for her (Linda) to use it whenever she desired. When Mrs. Bradshaw was interrogated on direct examination as to whether she had known prior to the accident of March 10, 1966, that Linda had driven the 1962 Ford without prior parental permission, she responded firmly, "I surely didn't." On cross-examination, this was her testimony on the same subject: "Q. When did you first learn Linda had been slipping the car out on different occasions? . . . A. I think one time she told me one time since she was home from the hospital she took one of the boys to the bus station . . . . Q. That was before the accident she told you? A. That was one time and I think the only time she remembers, yes . . . . I forget when she told me that really . . . ." After counsel's suggestion on redirect examination that "there has been some confusion," the following ensued: "Q. When did you learn for the first time that Linda, without your permission, had taken the boy down to catch the train [sic]? I don't mean when the incident occurred, I mean when you first found out about it. A. I really don't remember . . . . Q. We realize the transaction where she took the boy to the railroad station so he could get a train, without your permission, was before the accident we are concerned about . . . . My question is when did you find out about that? Was that before the

---

1. Although Linda began to drive the 1962 Ford when she was only fourteen years of age, it was not shown whether she then held either a "restricted license" [K.S.A. 8–237] or an "instruction permit" [K.S.A. 8–239], and the record does not disclose whether she ever applied for or obtained a driver's license.

accident or after? A. No, I think after . . . just lately."

On the evening of March 9, 1966, plaintiff Karen came to the Bradshaw home about 9:30 to 9:45 P.M. after a "babysitting" assignment elsewhere. Her "boy friend," one Bill Green, arrived shortly thereafter but (so she said) departed by 10:45 to 10:50 P.M. Sometime later (the only recorded time being that of "about 11 o'clock" suggested by plaintiffs' counsel in a question addressed to Mrs. Bradshaw) defendant Linda, leaving Karen in another part of the house, had a private conversation with her mother in the hallway.

*Karen's asserted knowledge* concerning this event was reflected by the following questions and answers on direct examination: "Q. The night of the accident where did she [Linda] get the keys to drive that automobile [the 1962 Ford]? A. She left the room and went into the hall, was talking to her mother and she returned with the keys. Q. Did she have nothing in her hand before she went to the hallway to get the keys? A. Yes. Q. Did she come back with the keys? A. Yes, sir. Q. Then did you get in the automobile and leave? A. Yes, sir." Karen did not overhear the conversation between Linda and her mother, and there was no suggestion that they were then within the range of Karen's vision.

*Mrs. Bradshaw's testimony* concerning this conversation was: "A. I had got up out of bed to see why she [Linda] wasn't going to bed. There was music playing and she said, 'Mother, I will go to bed the minute Karen gets back with her boy friend.' [Mrs. Bradshaw previously had stated that Linda had sought permission to ask Karen to stay all night with her.] So I relaxed and went to bed. I don't remember her leaving. Q. . . . You did talk to her? A. I think she said something like, 'Tell the kids goodnight.' I don't remember anything else said. Q. When she came in [the hallway] she didn't have any car keys in her hand . . .? A. She didn't have no car keys at all when she left me.

Q. She didn't? A. She must have had them in her purse. I didn't give her no keys, I definitely didn't give her no keys. Q. When did you first learn Linda had a key made to the car? A. In the hospital [after the accident] she told me . . . ."

*Linda* agreed that she had talked with her mother in the hallway on the evening of March 9, but specifically denied that she either had obtained any keys from her mother that evening or had told her mother she was leaving in the Ford. "If I [had], I wouldn't have got to go." When asked whether she denied Karen's testimony that "you [Linda] went into the hall with your hands empty and talked to your mother and came out with the car keys," the reply was "I certainly don't remember; I had my keys in my purse always."

A short while after the hallway conversation, Linda and Karen left in the Ford. Karen did not then know that Linda intended to head for Joplin, Missouri. However, Linda was, at the time, "going steady" with a "boy friend," Gary Henson, who resided in Joplin but called at the Bradshaw home in Pittsburg quite frequently. So she drove to the Henson home in Joplin arriving there (so she thought) about midnight, saw Gary's father in the front room, and contented herself for the moment with leaving "a note . . . in the car." The record discloses no information concerning the ensuing peregrinations and adventures of the girls in the 1962 Ford prior to the tragic accident about 1 A.M. on U.S. Highway 71 approximately one-half mile south of Interstate I–44 in Newton County, Missouri. And we are uninformed as to where they were going at that time or even in which direction they were traveling, although we do know judicially that Pittsburg is some thirty miles northwest of the Henson home in Joplin while the place of accident is approximately five miles southeast of that point. State ex rel. Alton R. Co. v. Shain, 346 Mo. 681, 692, 143 S.W.2d 233, 238(8); Klotsch v. P. F. Collier & Son Corp., 349

Mo. 40, 46, 159 S.W.2d 589, 592(1); Hood v. M.F.A. Mutual Ins. Co., Mo.App., 379 S.W.2d 806, 810(4).

When notified of the accident, Karen's parents picked up Linda's mother and the three of them came to the Joplin hospital to which the girls had been admitted. Because of their condition the investigating trooper apparently had been unable to obtain any information from them, for he told the parents that Karen "was the driver of the car and it was [the Bourne] car." But, when he described the automobile as a 1962 Ford Galaxie, Linda's mother exclaimed "Oh, my God, that is my car," and thus first discovered (so she declared) that Linda had taken the 1962 Ford that night.

Between 2 and 4 A.M. as the anxious parents talked in the waiting room at the hospital, Linda's mother showed Karen's father some car keys. According to Mr. Bourne, he saw "quite a few *sets* of car keys . . . five, maybe six" and Mrs. Bradshaw said "that they were for various members of the family and others to use the [1962 Ford] car." Mrs. Bradshaw testified that she indeed did show Mr. Bourne some keys, at the same time expressing her bewilderment with the query, "where in the world could she [Linda] have gotten a key," but that she then displayed to Mr. Bourne *not* five *sets* of keys but only "three ignition . . . and two to the trunk; five keys altogether . . . two sets and one ignition key." The ignition key had been made when she had thought one set of keys, later found in a car pocket, had been lost.

■ Karen's parents also related other statements allegedly made by Linda's mother while they were in the hospital waiting room on the night of accident, e. g., " 'if Karen was the driver of the car—even though Karen was the driver of the car, I

have good insurance which will take care of Karen' "; " 'don't worry, I have good insurance and Karen will be well taken care of' "; and "Linda and Larry [her brother] were covered by insurance and she had good insurance on them." But we immediately put out of mind these and other similar utterances attributed to Linda's mother in the hospital waiting room because the rights and liabilities of the parties to the policy contract issued by garnishee were fixed definitely by the facts existing at the time of the accident, resolution of the determinative issue as to permission vel non depended upon what was said and done *prior* to the accident, and neither the named insured nor his spouse could have created or expanded, by unilateral post-accident utterances, the coverage afforded by the policy contract.[2]

Opposing counsel are in full agreement not only that the substantive rights of the parties to the contract of insurance in suit, which was made in Kansas, are determinable under Kansas law [Brumbaugh v. Travelers Indemnity Co., Mo.App., 396 S.W.2d 740, 741(1); Horn v. Allied Mutual Cas. Co., 10 Cir. (Kan.), 272 F.2d 76, 78–79(1) ], but also that the Kansas law and the Missouri law delineating such substantive rights are in accord. We proceed on the same basis.

■ As we understand it, plaintiffs' theory of *express permission* is that such might be found on the basis of plaintiff Karen's account of what occurred in the Bradshaw home on the night of accident, more specifically that defendant Linda went into the hall with nothing in her hands, talked with her mother, and returned with the keys to the 1962 Ford. We do not agree. To be express, permission "must be of an affirmative character, directly and distinctly stated, clear and outspoken, and

2. Hanover Insurance Co. v. Abchal, Mo. App., 375 S.W.2d 605, 609–610(6, 7); Helmkamp v. American Family Mut. Ins. Co., Mo.App., 407 S.W.2d 559, 571–572 (20, 21); Bekaert v. State Farm Mut. Auto. Ins. Co., 8 Cir., 230 F.2d 127, 130–131(4); C. H. Elle Construction Co. v. Western Casualty & Surety Co., 9 Cir., 294 F.2d 459, 462–464(3); American Ins. Co. v. McMichael, D.C.Mo., 238 F.Supp. 154, 157(5).

not merely implied or left to inference." [3] No such permission may be found on the record before us.

■ However, plaintiffs' alternative theory of *implied permission,* upon which they primarily rely, may not be ruled so quickly. We immediately recognize that one relying upon implied permission must prove it,[4] that no implied permission arises merely because someone obtains possession of a vehicle and uses it without the knowledge of the named insured,[5] and that the permission contemplated by the omnibus clause is something more than mere sufferance or tolerance without taking steps to prevent, that term being used rather in the sense of leave, license or authority with the power to prevent.[6] But implied permission is not confined to affirmative action,[7] and "is not necessarily limited to that granted by arrangement between the parties or otherwise in definite, express terms." [8] It may and usually does arise from a course of conduct of the parties over a period of time prior to the use in question.[9]

■ In the case at bar, there was evidence that, over a period of "a couple of years anyway" prior to the accident under consideration, Linda had driven the 1962 Ford "regularly" and "on many different occasions" not only during the day but also "of an evening"; that she had operated the automobile between Pittsburg and St. Paul on two occasions; that, although she "lived close," Linda "rarely walked" but "usually came [to Karen's home] in the car"; and that "to [Karen's] knowledge" Linda had the "use of the [1962 Ford] every time she wanted it." In their brief, garnishee's counsel argued that such testimony by plaintiffs, "admittedly very interested parties," was "of no probative value," was "nothing more than the witnesses' conclusion," and was "not substantial so as to justify an inference" of permissive user on the night of accident. And upon oral argument, counsel reiterated that this was "not the caliber or quality of evidence" required to sustain plaintiffs' burden of proof, emphasized that such testimony was that of "very interested people"— "people with $10,000 worth of interest," and complained that "the trial judge

3. Hinton v. Indemnity Ins. Co. of North America, 175 Va. 205, 8 S.E.2d 279, 283 (6); Hardware Mutual Cas. Co. v. Jones, 4 Cir., 363 F.2d 627, 631; Hawley v. Indemnity Ins. Co. of North America, 257 N.C. 381, 126 S.E.2d 161, 164(3); 7 Am.Jur.2d Automobile Insurance § 113, l. c. 427. See 7 Appleman Insurance Law and Practice § 4365, l. c. 303.

4. Straughan v. Asher, Mo.App., 372 S.W. 2d 489, 493(2); Hartford Acc. & Ind. Co. v. List, Mo.App., 424 S.W.2d 761, 767; Rakestraw v. Allstate Ins. Co., 238 S.C. 217, 119 S.E.2d 746, 749(5); State Farm Mut. Auto. Ins. Co. v. American Cas. Co., 150 W.Va. 435, 146 S.E.2d 842, 850(5).

5. Varble v. Stanley, Mo.App., 306 S.W.2d 662, 666(5); Nye v. James, Mo.App., 373 S.W.2d 655, 660(8); American Ins. Co. v. McMichael, supra note 2, 238 F. Supp. at 156(4); 7 Blashfield Automobile Law and Practice (3rd Ed.) § 315.10, l. c. 608.

6. Haynes v. Linder, Mo.App., 323 S.W.2d 505, 510(8); M.F.A. Mutual Ins. Co. v. Alexander, Mo.App., 361 S.W.2d 171, 179,

180; Nye v. James, supra note 5, 373 S.W.2d at 660(8); Helmkamp v. American Family Mut. Ins. Co., supra note 2, 407 S.W.2d at 570.

7. State Farm Mut. Auto. Ins. Co. v. Cook, 186 Va. 658, 43 S.E.2d 863, 867(5), 5 A.L.R.2d 594, 599(4); Globe Indemnity Co. v. French, Tex.Civ.App., 382 S.W. 2d 771, 774, error ref. n. r. e.; 7 Am.Jur. 2d Automobile Insurance § 113, p. 425; 7 Appleman Insurance Law and Practice § 4365, l. c. 303.

8. Tomasetti v. Maryland Cas. Co., 117 Conn. 505, 169 A. 54, 55(3); Hinton v. Indemnity Ins. Co. of North America, supra note 3, 8 S.E.2d at 283(6). See Winterton v. Van Zandt, Mo., 351 S.W.2d 696.

9. Mazdra v. Selective Ins. Co., Mo., 398 S.W.2d 841, 844; Hanover Ins. Co. v. Abchal, supra note 2, 375 S.W.2d at 609 (4); Alabama Farm Bureau Mut. Cas. Ins. Co. v. Robinson, 269 Ala. 346, 113 So.2d 140, 146(2); 7 Am.Jur.2d Automobile Insurance § 113, p. 425; 7 Appleman Insurance Law and Practice § 4365, l. c. 304.

should have been aware of the interest of those who testified." However, the noted testimony may not be treated so lightly or dismissed so casually. True, much of it was conclusionary in character, interspersed with an occasional dash of hearsay. But regardless of whether such testimony might have been excluded on timely and appropriate objections or motions to strike, the probative worth and value of both the conclusionary [10] and hearsay [11] evidence were for the trier of the facts, since all of it was received without objection or motion to strike. "Evidence of this character, received without objection, is to be considered in determining whether plaintiff made a submissible case [Ridenhour v. Oklahoma Contracting Co., Mo.App., 45 S.W.2d 108, 112] and may be sufficient to support a judgment. Boswell v. Consolidated School Dist. No. 8 of Newton Co., Mo.App., 10 S. W.2d 665, 666(2), appeal dismissed 323 Mo. 43, 18 S.W.2d 61; Hillin v. LaFayette Land & Farming Co., Mo.App., 296 S.W. 243; 53 Am.Jur. Trial, § 135, p. 119." Ferrell v. Sikeston Coca-Cola Bottling Co., Mo.App., 320 S.W.2d 292, 296(7).

In this connection, we recall that, upon trial of the damage suit, defendant Linda agreed that she had the use of the 1962 Ford "when [her mother] wasn't using it." We have not overlooked Linda's subsequent explanation in the garnishment proceeding as to "what I meant" by the fore-going testimony in the damage suit, but we also have in mind that the circuit judge was not required to accept that explanation. For, under his duty as trier of the facts to weigh the evidence, he might have believed or disbelieved any testimony affirmatively or defensively adduced by any party, even though such testimony was uncontradicted and unimpeached.[12]

That the trial court did not accept at face value all of the testimony adduced by garnishee from defendant Linda and her mother was made manifest in his memorandum. In dealing with garnishee's contention that, on the night of accident, Linda had taken the 1962 Ford without the prior permission or knowledge of her mother by using the extra key, the existence of which was allegedly then unknown to her mother, the trial judge significantly commented: "Linda Bradshaw stated that her mother did not know about this extra key, but her demeanor on the stand led the court to be extremely doubtful about her veracity in this matter." After noting that Linda had used the Ford several times by employing the extra key, the trial court observed that "Mrs. Bradshaw was aware of at least one of these occasions when Linda used the [extra] key, although she testified that she *thought* that she learned of this use of the car after the accident . . . ." (Emphasis by trial court) The hereinbefore-quoted testimonial excerpts suffice to illus-

10. Vosburg v. Smith, Mo.App., 272 S.W. 2d 297, 302(9); Ashley v. Williams, 365 Mo. 286, 293, 281 S.W.2d 875, 880; Steeley v. Kurn, 348 Mo. 1142, 1144, 157 S.W.2d 212, 213(4); Doyle v. St. Louis Merchants' Bridge Terminal Ry. Co., 326 Mo. 425, 432, 31 S.W.2d 1010, 1012(4), certiorari denied 283 U.S. 820, 51 S.Ct. 345, 75 L.Ed. 1435; Fellows v. Farmer, Mo.App., 379 S.W.2d 842, 846(2); Cox v. Frank L. Schaab Stove & Furniture Co., Mo.App., 83 S.W.2d 211, 216(4); Ridenhour v. Oklahoma Contracting Co., Mo.App., 45 S.W.2d 108, 112(4).

11. Appelhans v. Goldman, Mo., 349 S.W. 2d 204, 207(5); Goodman v. Allen Cab Co., 360 Mo. 1094, 1100, 232 S.W.2d 535, 539(4); DeMoulin v. Roetheli, 354 Mo. 425, 434, 189 S.W.2d 562, 565(3); Turn-

er v. Yellow Cab Co. of Springfield, Mo. App., 361 S.W.2d 149, 154–155(1); Edmisten v. Dousette, Mo.App., 334 S.W.2d 746, 753; Burley v. State Social Security Com'n., 236 Mo.App. 930, 932, 163 S.W. 2d 95, 96(2).

12. Beckemeier v. Baessler, Mo., 270 S.W. 2d 782, 787(5); Adam Hat Stores Inc. v. Kansas City, Mo. (banc), 316 S.W.2d 594, 598(3); Ethridge v. Perryman, Mo., 363 S.W.2d 696, 701(5). See State ex rel. Rice v. Public Service Com'n., 359 Mo. (banc) 109, 116–117, 220 S.W.2d 61, 65(10); Sartin v. Sartin, Mo.App., 349 S.W.2d 705, 710(6); American Casualty Co. of Reading, Pa. v. Windham, D.C.Ga., 26 F.Supp. 261, 263(2), affirmed 107 F.2d 88; Rasmussen v. Gresly, 8 Cir. (Neb.), 77 F.2d 252.

trate our observation that on some pertinent and provocative factual questions the testimony of both Linda and her mother was confused and confusing. As to other relevant factual particulars, their testimony was notably silent. E.g., although Linda admittedly had driven the 1962 Ford on many occasions over a period of some two years prior to the accident, neither she nor her mother divulged any specific information concerning such subjects as these, to wit, (a) where the keys to the Ford *usually* were kept when not in use, (b) whether they were, either regularly or at times, left where they were readily accessible to Linda, or (c) whether, prior to the time Linda had the extra key made, (1) it was necessary for her to obtain the keys from her mother shortly before each use of the Ford and to return them to her mother promptly after each such use or (2) she either regularly or at times retained possession of a set of keys.

■■■■ As garnishee asserts, the prior course of conduct, from which implied permission may be inferred, must have been one in which there has been "mutual acquiescence or lack of objection signifying consent." 7 Appleman Insurance Law and Practice § 4365, 1. c. 303. But this does not rigidly restrict the uses for which permission may be implied or inferred to those of which the insured has been given specific notice in advance. "Permission" may have a negative as well as an affirmative implication, in that "a permitted act may be one not specifically prohibited as contrasted to an act affirmatively and specifically authorized." Brower v. Employers' Liab. Assur. Co., 318 Pa. 440, 177 A. 826, 829; Hinton v. Indemnity Ins. Co. of North America, 175 Va. 205, 8 S.E.2d 279, 283. See Mazdra v. Selective Ins. Co., Mo., 398 S.W.2d 841, 843–845. And, since the inference of implied permission usually arises from a prior course of conduct, it may be found to extend to uses of which the insured had no advance notice [Standard Accident Ins. Co. v. Gore, 99 N.H. 277, 109 A.2d 566, 570(6)] or even in some circumstances to a use thereto-

fore disapproved by the insured. State Farm Mut. Auto. Ins. Co. v. Williamson, 9 Cir. (Ariz.), 331 F.2d 517, 520–521. Of course, in each instance the issue as to implied permission vel non must be determined on the particular facts and circumstances of the case at hand. Great American Ins. Co. v. McDowell, D.C.S.C., 276 F.Supp. 702, 706.

■■■■ It is our considered opinion that the experienced and discerning circuit judge, as trier of the facts, reasonably could have inferred and found, on the record before him, that Linda was driving with implied permission at the time of the accident under consideration. Being of this mind, we are constrained to conclude that the judgment nisi should be affirmed. In so ruling, we are cognizant that, as garnishee emphasizes, our duty is to "review the case upon both the law and the evidence as in suits of an equitable nature" [Rule 73.01(d); § 510.310(4)], and that, in such review de novo, we reach our own conclusions as to the weight of the evidence. Hampton v. Niehaus, Mo., 329 S.W.2d 794, 800(6); Trotter v. Trotter, Mo., 316 S.W.2d 482, 484(2); Masterson v. Plummer, Mo.App., 343 S.W.2d 352, 354 (1). But we also are mindful that in the discharge of our appellate function we must respect the plain admonition that due regard should be given to the superior opportunity of the trial court to judge of "the credibility and characteristics of the witnesses who testified before him" [Peine v. Sater, Mo., 289 S.W.2d 101, 102(1); Cull v. Pfeifer, Mo., 307 S.W.2d 424, 428(5); Spaeth v. Larkin, Mo., 325 S.W.2d 767, 771(3); Allen v. Smith, Mo.App., 375 S.W.2d 874, 880(8)] and the explicit mandate that "[t]he judgment shall not be set aside unless clearly erroneous." Rule 73.01(d); § 510.310(4). See Rothenhoefer v. City of St. Louis, Mo., 410 S.W. 2d 73, 75(2); In re Estate of O'Neal, Mo., 409 S.W.2d 85, 90(1); Clinton v. Staples, Mo.App., 423 S.W.2d 1, 3(4, 5); Winterton v. Van Zandt, Mo.App., 374 S.W.2d 631, 633(2).

In Scaltreto v. Shea, 352 Mass. 62, 223 N.E.2d 525 (1967), added to instant garnishee's brief at the time of submission, the uncontradicted evidence was that one Shea 16 years of age, the insured's cousin who took her automobile by using duplicate keys made without her knowledge, had never been permitted to drive it "unless there was some licensed person with him except when he turned the car around to wash it in front of the house where he lived." 223 N.E.2d at 527. Hence, as in M.F.A. Insurance Co. v. Lawson, Mo.App., 336 S.W.2d 123, 125, and Helmkamp v. American Family Mutual Ins. Co., Mo. App., 407 S.W.2d 559, 570, "[t]here [was] no room . . . for application of the rule of prior conduct." Scaltreto is neither factually analogous nor legally persuasive here.

The judgment for plaintiffs is affirmed.

HOGAN, P. J., and TITUS, J., concur.